32

ANN SPINOSA et al., Appellants-Respondents, v STEVEN L. WEINSTEIN, D.P.M., et al., Respondents-Appellants, and ROBERT P. HOCHRAN, D.P.M., Respondent.

Second Department, May 31, 1991

## APPEARANCES OF COUNSEL

*Howard S. Davis & Associates (Janine Silver* of counsel), for appellants-respondents.

*Kopff, Nardelli & Dopf (Martin B. Adams* and *Scott F. Morgan* of counsel), for respondents-appellants.

*Riechenbaum & Silberstein, P. C. (Meryl R. Neuren, Joseph P. Awad* and *Dennis Connor* of counsel), for respondent.

### OPINION OF THE COURT

EIBER, J.

■ ■ ■ ■ One of the primary issues presented on this appeal is whether the podiatrist who acted as surgical assistant in a series of operations performed on the plaintiff Ann Spinosa's feet was obligated to obtain her informed consent before participating in the procedures undertaken. For the reasons which follow, we conclude that the surgical assistant was not so obligated, and, therefore, that the Supreme Court properly granted his motion for summary judgment dismissing the complaint insofar as it is asserted against him. We further conclude that the Supreme Court properly granted those branches of the remaining defendants' joint motion which were for summary judgment dismissing the plaintiffs' claims to recover damages for assault, battery, and fraud, but find that the court should have additionally granted that branch of the motion which was for summary judgment dismissing the plaintiffs' demand for punitive damages.

The plaintiffs in this podiatric malpractice action are Mrs. Ann Spinosa and her husband Robert. Mrs. Spinosa, a 54-year-old housewife and mother of two, alleges that she first sought treatment from Dr. Steven Weinstein, a Staten Island podiatrist, for the removal of a corn on January 8, 1979. Although the facts of this case are sharply disputed, Mrs. Spinosa claims that when Dr. Weinstein examined her feet during this first visit and discovered that she had bunions, he remarked "[d]id anybody ever tell you that you don't have to live with this kind of feet?" Mrs. Spinosa replied that she had heard about bunion removal surgery, but that she had children and a family, and could never consider surgery. In response, Dr. Weinstein advised Mrs. Spinosa that his office performed ambulatory surgery, and that she would not have to be "laid up for any length of time". Dr. Weinstein further assured Mrs. Spinosa that she would have beautiful feet after the bunion removal surgery. Before leaving the podiatrist's office, Mrs. Spinosa was given informational pamphlets about ambulatory surgery.

When Mrs. Spinosa returned to Dr. Weinstein's office

shortly thereafter to discuss his proposed plan of treatment for her feet, she spontaneously decided to undergo surgery, telling Dr. Weinstein "[m]aybe we should go ahead as long as you think that I will have a beautiful foot". During this visit, Dr. Weinstein commenced "forefoot reconstruction", a process intended to "totally address all of the problems which were contributing to the foot condition, including soft tissue deformities, bone deformities, [and] joint deformities". On 14 occasions over the next 2½ years, Dr. Weinstein performed a series of 34 surgical procedures on Mrs. Spinosa's feet, including four procedures to remove her bunions and several procedures designed to correct misalignment of her toes. The plaintiffs claim that this process, in which a podiatrist breaks down a surgical procedure into its component parts, and then performs the components over a course of time rather than in a single operation, is known as "fragmentation surgery".

According to the plaintiffs, fragmentation surgery is a discredited practice in the podiatric field because its purpose is to allow the podiatrist to bill the patient's medical insurer a greater sum than would be permissible had the procedures been completed in a single hospital visit. Dr. Weinstein maintains, however, that fragmentation surgery may also constitute a medically acceptable option for a patient, such as Mrs. Spinosa, who wishes to remain on her feet and perform her daily activities while corrective procedures are performed. Comparing the two methods of procedure, Dr. Weinstein further explained that the reconstructive surgery performed on Mrs. Spinosa's feet would have required two separate three-hour operations if performed in a hospital setting. Moreover, according to Dr. Weinstein, Mrs. Spinosa would have remained hospitalized for five days following each operation, would have been required to wear a cast for approximately two months, and would have been unable to wear normal shoes for 3 to 4 months. Although Dr. Weinstein estimated that the total cost of two hospital operations to correct Mrs. Spinosa's feet would have been $10,000, the total amount billed for the 14 operations performed in his office was $17,280.

Mrs. Spinosa alleges that the surgical procedures performed by Dr. Weinstein have caused serious, permanent damage to her feet. For example, she maintains that Dr. Weinstein improperly cut the tendons in her toes, and that as a result, her toes fan out and she is completely unable to move them. She further alleges that Dr. Weinstein cut a bone too short,

causing her to walk on a joint, and her feet to become swollen and inflamed. All of Mrs. Spinosa's toes have become hammered, and her feet now cause her constant pain. In addition, her feet are scarred and disfigured.

The plaintiffs subsequently commenced this action against Dr. Weinstein and his professional corporation in May 1983. Also named as defendants in the action were Dr. Richard Steinberg, who participated in a preceptorship in Dr. Weinstein's office in 1979, and Dr. Robert Hochran, a podiatrist who joined Dr. Weinstein's practice as a part-time, hourly employee in May 1979. While the record discloses little information concerning Dr. Steinberg's role in Mrs. Spinosa's care and treatment, the record establishes that Dr. Hochran acted as a surgical assistant during 11 of the 34 surgical procedures performed on Mrs. Spinosa's feet, and that he participated in her follow-up care, by, *inter alia,* removing sutures and changing bandages. The plaintiffs' complaint alleges five causes of action against all three doctors to recover damages based upon (1) podiatric malpractice, (2) lack of informed consent, (3) assault and battery, (4) fraud, and (5) loss of services. The complaint additionally includes a demand for punitive damages.

Following extensive discovery, in September 1988 Dr. Weinstein, his professional corporation, and Dr. Steinberg (hereinafter the Weinstein defendants) jointly moved for summary judgment dismissing the plaintiffs' demand for punitive damages as well as their third cause of action to recover damages for assault and battery, and fourth cause of action to recover damages for fraud. Dr. Hochran subsequently moved for summary judgment dismissing the complaint insofar as asserted against him, contending, among other things, that he had no duty to advise Mrs. Spinosa of the risks of the surgical procedures performed by Dr. Weinstein, and that he had committed no malpractice in the performance of his duties as surgical assistant.

By decision dated January 30, 1989, the Supreme Court concluded that Mrs. Spinosa's assault and battery cause of action should be dismissed because it was predicated upon lack of informed consent, which is now generally considered a form of medical malpractice. The court additionally dismissed the fraud claim, finding that it was duplicative of the cause of action sounding in lack of informed consent. However, in light of Mrs. Spinosa's claim that the Weinstein defendants performed fragmentation surgery for their economic gain, the

court concluded that a triable issue of fact existed as to whether the plaintiff's demand for punitive damages was proper. Finally, the court granted Dr. Hochran's motion for summary judgment in its entirety, reasoning that since he had not performed any surgical procedure upon Mrs. Spinosa, he had no duty to obtain her informed consent. This appeal and cross appeal ensued.

### *Dr. Hochran's Role in Mrs. Spinosa's Care and Treatment*

One of the central issues presented on appeal is whether Dr. Robert Hochran, who acted as Dr. Weinstein's surgical assistant and provided follow-up care to Mrs. Spinosa, should be held liable for failing to inform her of the potential risks of the procedures which were performed on her feet. In their verified bill of particulars dated February 16, 1984, the plaintiffs generally alleged that Dr. Hochran had "imparted no information concerning possible risks of the procedures which were performed", and that he "should have advised [Mrs. Spinosa] that there was *[sic]* risks and hazards associated with the procedures and complications requiring further treatment and residuals *[sic]* damage could develop". The record reveals, however, that Dr. Hochran's primary functions as surgical assistant consisted of administering a local anesthetic to Mrs. Spinosa and handing instruments to Dr. Weinstein. Indeed, testifying at an examination before trial in October 1983, Dr. Weinstein admitted that Dr. Hochran's role in Mrs. Spinosa's surgeries "was strictly as a surgical assistant", and entailed that he "simply * * * hold retractors or to do something like that". Dr. Weinstein added that Dr. Hochran "never did any cuts, he never did any bone work. He may have held a hemostat while I tied a bleeder or something, but the actual work was my work". Mrs. Spinosa similarly conceded during her examination before trial in August 1984, that Dr. Hochran performed no actual surgery on her feet. Moreover, when asked what treatment Dr. Hochran provided during her postoperative visits, Mrs. Spinosa explained that he "checked to see if the surgery was healing. It was more or less a follow-up type of thing, not that he did anything". Mrs. Spinosa voiced no specific complaints concerning Dr. Hochran's treatment, and indeed commented that he "always seemed to have empathy in his face for me when I complained", and that he "would try his best" to make her comfortable when she complained of pain.

## The Duty To Obtain Informed Consent

Public Health Law § 2805-d (1) defines "lack of informed consent" to be "the failure of the person providing the professional treatment or diagnosis to disclose to the patient such alternatives thereto and the reasonably foreseeable risks and benefits involved as a reasonable medical, dental, or podiatric practitioner under similar circumstances would have disclosed".

Those cases which have considered a physician's duty to obtain a patient's informed consent in the context of single surgical procedures performed in hospital settings have generally refused to impose liability upon surgical assistants or referring physicians who neither ordered nor performed the subject procedure *(see, e.g., Abram v Children's Hosp.,* 151 AD2d 972; *Nisenholtz v Mount Sinai Hosp.,* 126 Misc 2d 658; *Hill v Seward,* 122 Misc 2d 375; *Prooth v Wallsh,* 105 Misc 2d 603; *see also, Ritter v Delaney,* 790 SW2d 29 [Tex]; *Harnish v Children's Hosp. Med. Center,* 387 Mass 152, 439 NE2d 240). For example in *Prooth v Wallsh (supra),* the plaintiff sued his treating physician, the chief surgeon, the surgeon's assistant, and a private consulting cardiologist for injuries resulting from a surgical procedure, based in part upon a theory of lack of informed consent. Both the plaintiff's personal treating physician and chief surgeon had recommended the operation. The Supreme Court held that only the plaintiff's personal physician, who had retained a degree of participation in his treatment, and the chief surgeon who operated upon him, were obligated to obtain his informed consent to the procedure. In holding that there was no duty owed by the "assisting surgeon, called in to the operation by the chief surgeon and answerable to him" *(Prooth v Wallsh, supra,* at 606), or the hospital employees who comprised the remainder of the surgical team, to obtain the patient's informed consent, the court reasoned that: "while a participant may be responsible to the patient to explain the particular risks of his phase of the treatment, for example, surgery or anesthesia, it does not automatically follow that he has an obligation to inform the patient of the risks of another participant's treatment" *(Prooth v Wallsh, supra,* at 605).

In *Nisenholtz v Mount Sinai Hosp.* (126 Misc 2d 658, *supra),* the Supreme Court interpreted a referring physician's duty to obtain his patient's consent more narrowly, holding that a gastroenterologist who had treated the plaintiff for 10 years

prior to referring him to a surgeon was not obligated to obtain the plaintiff's informed consent to surgery: "it is clearly not necessary that every physician or health care provider who becomes involved with a patient obtain informed consent to every medical procedure to which the patient submits. Rather, it is the responsibility of a physician to obtain informed consent to those procedures and treatments which the physician actually prescribes or performs" *(Nisenholtz v Mount Sinai Hosp., supra,* at 663). In reaching its conclusion that the referring physician had no duty to obtain the plaintiff's informed consent, the Supreme Court in *Nisenholtz* criticized the *Prooth* court's extension of liability to the plaintiff's personal physician, concluding that: "such liability will arise only upon joint action by the referring physician and surgeon or some control of the surgeon's treatment by the referring physician. For liability to arise, the referring physician must do more than retain 'a degree of participation,' as described in *Prooth.* The referring physician should be held liable only when that physician has ordered a procedure or actually participates in the treatment or procedure" *(Nisenholtz v Mount Sinai Hosp., supra,* at 664).

Although *Prooth* and *Nisenholtz (supra)* can be factually distinguished on the grounds that the degree of Dr. Hochran's participation in Mrs. Spinosa's care and treatment exceeded that of a referring doctor, or of a surgical assistant in a single operation performed in a hospital setting, we nevertheless decline to hold, as the plaintiffs urge, that Dr. Hochran was under a duty to obtain Mrs. Spinosa's informed consent to the series of surgical procedures recommended and performed by Dr. Weinstein. While we recognize that Dr. Hochran can be considered a "person providing the professional treatment" within the meaning of Public Health Law § 2805-d (1), the overly broad interpretation of the statute which the plaintiffs favor would extend a physician's duty to obtain his patient's informed consent to encompass a requirement that he inform a patient about the risks inherent not only in his phase of treatment, but of the risks inherent in the treatment rendered by others. Under such an interpretation, a patient facing surgical treatment would have to be repeatedly advised of the same surgical risks, which could serve to discourage the patient from having necessary treatment performed. Moreover, such an extension of a physician's duty to obtain his patient's informed consent is unnecessary for the protection of the patient, since existing case law obligates the physician

who has prescribed or is to perform the procedure to obtain the patient's informed consent *(see, Blank v Rosenthal,* 84 AD2d 688; *Nisenholtz v Mount Sinai Hosp.,* 126 Misc 2d 658, *supra; Prooth v Wallsh,* 105 Misc 2d 603, *supra).*

Furthermore, imposing an obligation upon Dr. Hochran to advise Mrs. Spinosa of the risks of the surgery performed in this case would represent an unwarranted intrusion into the physician-patient relationship between Mrs. Spinosa and Dr. Weinstein, a relationship which was established approximately six months before Dr. Hochran joined the practice. As the Supreme Court noted in *Prooth v Wallsh (supra),* such interference in the physician-patient relationship is not necessarily in the patient's best interest: "[T]he relationship between the physician and his patient 'is always one of great delicacy. And it is perhaps the most delicate matter, often with fluctuating indications, from time to time with the same patient, whether a physician should advise the patient (or his family), more or less, about a proposed procedure, the gruesome details, and the available alternatives. Such a decision is particularly one calling for the exercise of medical judgment. * * * In the exercise of that discretion, involving as it does grave risks to the patient, a third party should not ordinarily meddle' " *(Prooth v Wallsh,* 105 Misc 2d 603, 606, *supra,* quoting *Fiorentina v Wenger,* 19 NY2d 407, 415-416).

Relying on *Prooth (supra),* the Washington State Court of Appeals held in *Alexander v Gonser* (42 Wash App 234, 711 P2d 347), that a hospital had no duty to advise a patient that the results of a fetal heart monitor test of her unborn child were "equivocal", and that an immediate Caesarean section could be necessary. The court held that "[a]ny duty to inform [the patient] of the test results would have been that of her privately retained physician, not the hospital or its personnel. * * * To hold a hospital or its employees have a duty to intervene in the independent physician/patient relationship, unless the hospital is aware of circumstances more extraordinary than those in the record before this court, would be far more disruptive than beneficial to a patient" *(Alexander v Gonser, supra,* 42 Wash App, at 239, 711 P2d, at 351). We therefore conclude that the Supreme Court properly determined that Dr. Hochran had no duty to obtain Mrs. Spinosa's informed consent to the surgical procedures performed on her feet, and, in the absence of any evidence suggesting that Dr. Hochran performed his limited duties negligently, the court

properly dismissed the plaintiffs' complaint insofar as it is asserted against him.

There remains for our consideration the issue of whether the Supreme Court properly granted those branches of the Weinstein defendants' motion which were for summary judgment dismissing the plaintiffs' claims to recover damages for assault and battery and for fraud.

### Assault and Battery

■ Turning first to the assault and battery issue, we note that traditionally, an action to recover damages for lack of informed consent has been viewed as constituting the common-law tort of assault and battery *(see, Schloendorff v Society of N. Y. Hosp.,* 211 NY 125; *Fogal v Genesee Hosp.,* 41 AD2d 468, 473; *Darrah v Kite,* 32 AD2d 208, 210-211).* The modern view, however, is that the failure of a doctor to properly inform his patient of the risks of an operation is a form of medical malpractice based on negligence *(see, Rigie v Goldman,* 148 AD2d 23, 28-29; *Oates v New York Hosp.,* 131 AD2d 368; *Murriello v Crapotta,* 51 AD2d 381).* On appeal, Mrs. Spinosa submits that her assault and battery claim is nevertheless viable because Dr. Weinstein obtained her consent to surgery by fraudulently representing that he could make her feet beautiful, and that her consent to surgery was, therefore, tantamount to no consent at all. While we agree that a claim for assault and battery may still be maintained in "nonexigent situations involving no consent at all" *(Rigie v Goldman,* 148 AD2d 23, 28, *supra; Oates v New York Hosp.,* 131 AD2d 368, *supra),* we note that the "[i]ntent to do injury is an essential element [of this intentional tort]" *(Murriello v Crapotta, supra,* at 382; *see, Mullany v Eiseman,* 125 AD2d 457, 458).* At bar, however, Mrs. Spinosa concedes that the defendants did not intend to harm her, and thus, even assuming that her consent was invalid, her claim for assault and battery must fail.

### Fraud

■ In addition, we find that the Supreme Court properly dismissed the plaintiffs' fourth cause of action, which sounds in fraud, and is predicated upon Mrs. Spinosa's claim that Dr. Weinstein promised her beautiful feet, and that she relied upon this promise to her detriment in consenting to surgery. It is settled law that concealment by a physician or failure to

disclose his own malpractice does not give rise to a cause of action in fraud or deceit separate from the customary malpractice action *(see, Simcuski v Saeli,* 44 NY2d 442; *Coopersmith v Gold,* — AD2d — [3d Dept, Apr. 11, 1991]). Thus, "[i]t is only when the alleged fraud occurs separately from and subsequent to the malpractice that a plaintiff is entitled to allege and prove a cause of action for intentional tort * * * and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice" *(Coopersmith v Gold, supra,* at —; *see also, La Brake v Enzien,* 167 AD2d 709; *Harkin v Culleton,* 156 AD2d 19). Since a doctor's failure to obtain his patient's informed consent is a form of malpractice based on negligence *(see, Rigie v Goldman, supra,* at 28-29; *Oates v New York Hosp., supra,* at 369), which does not encompass the intent to defraud, the plaintiffs' claims of fraud and lack of informed consent may be considered distinct. However, the injuries suffered by Mrs. Spinosa under either theory flow from her claim that she was induced to undergo unnecessary surgery. Accordingly, the damages allegedly sustained by virtue of the fraud are not separate and distinct from the damages allegedly sustained by virtue of the defendants' failure to obtain Mrs. Spinosa's informed consent, and the fraud claim must be dismissed *(see, Coopersmith v Gold, supra; La Brake v Enzien, supra; Harkin v Culleton, supra).*

### The Punitive Damages Claim

■ Finally, we disagree with the Supreme Court's conclusion that a triable question of fact precludes dismissal of the plaintiffs' demand for punitive damages. Research discloses no *medical malpractice action in this State where a judgment for punitive damages has been sustained,* and, as one commentator has explained, "[t]he most likely reason is that to recover punitive damages, the plaintiff has the burden of establishing the defendant's conduct was morally culpable or was actuated by evil motives" (Bard, New York Medical Malpractice § 26.03e [2]). Thus, for example, in *Gravitt v Newman* (114 AD2d 1000), this court dismissed a claim for punitive damages in an action commenced by patient whose doctor had left a portion of a surgical instrument inside her right leg. In reaching the decision to dismiss the claim, the court reasoned that: "punitive damages are available for the purpose of vindicating a public right only where the actions of the alleged tort-feasor constitute gross recklessness or intentional,

wanton or malicious conduct aimed at the public generally or are activated by evil or reprehensible motives *(Walker v Sheldon,* 10 NY2d 401; *Cohen v New York Prop. Ins. Underwriting Assn.,* 65 AD2d 71; *see also, Hollender v Trump Vil. Coop.,* 97 AD2d 812). Plaintiff has made no allegations beyond those of ordinary negligence or malpractice as would constitute the basis for an award of punitive damages. Accordingly, we also reverse that portion of the order of Special Term which permitted proof as to such a claim" *(Gravitt v Newman, supra,* at 1002).

Applying these principles at bar, we conclude that the plaintiffs' claim for punitive damages must be dismissed. A "doctor in a malpractice case is ordinarily not an actor who intends to inflict an injury on his patient" *(Dries v Gregor,* 72 AD2d 231, 235) and despite the plaintiffs' claim of fragmentation surgery performed for economic gain, there is no indication that Dr. Weinstein suggested surgery to harm Mrs. Spinosa, and indeed, Mrs. Spinosa concedes that Dr. Weinstein had no such intent. Thus, in essence, the plaintiffs' claim is merely that, given a choice between two different methods of performing the same procedure, Dr. Weinstein opted to perform the more expensive one. Absent any indication in the record that Dr. Weinstein's decision to perform surgery on the plaintiff was "activated by evil or reprehensible motives" *(Gravitt v Newman, supra,* at 1002), we conclude that the plaintiffs' claims are insufficient to warrant the imposition of punitive damages. Accordingly, the judgment is affirmed insofar as appealed from by the plaintiffs, reversed insofar as cross-appealed from by the Weinstein defendants, and that branch of the motion of the Weinstein defendants which was for summary judgment dismissing the plaintiffs' punitive damages claim is granted.

BROWN, J. P., KUNZEMAN and BALLETTA, JJ., concur.

Ordered that the judgment is affirmed insofar as appealed from by the plaintiffs; and it is further,

Ordered that the judgment is reversed insofar as cross-appealed from by the defendants Steven L. Weinstein, D.P.M., Steven L. Weinstein, D.P.M., P. C., and Richard J. Steinberg, D.P.M., and that branch of their motion which was for summary judgment dismissing the claim for punitive damages is granted; and it is further,

Ordered that one bill of costs is awarded to the defendants appearing separately and filing separate briefs.