■ YVETTE B. GRAHAM, as Administratrix of the Estate of ALPHATRUS BENS, SR., Deceased, Appellant, v COLUMBIA-PRESBYTERIAN MEDICAL CENTER et al., Respondents.—Order of the Supreme Court, Bronx County (Barry Salman, J.), entered August 30, 1991, which granted defendants' motion for partial summary judgment dismissing plaintiff's claim for punitive damages, reversed, on the law, without costs.

Plaintiff's decedent, Alphatrus Bens, Sr., underwent a transurethral resection at defendant Columbia-Presbyterian Medical Center. He was 71 years old at the time. His physician was defendant Jerry G. Blaivas, M.D., a board certified urologist. The procedure involved insertion of a cystoscope into the urethra to remove enlarged prostatic tissue, thus obviating the necessity of abdominal or perineal surgery. At midnight, a second procedure was performed by Sheldon Axelrod, M.D., the chief urology resident, and defendant Blaivas to stop bleeding from adjacent tissue. At 9:00 A.M. the following morning, Mr. Bens went into ventricular fibrillation for approximately one hour before responding to resuscitative measures. Later that afternoon, he again went into cardiac arrest and could not be revived. He died at approximately 5:00 P.M.

It is not disputed that at the conclusion of the operation, which began at 3:00 P.M. and ended just after 5:00 P.M., Mr. Bens was noted to have low blood pressure. The account of defendant Blaivas concerning what transpired thereafter differs sharply from that given by Dr. Sandra Curry, the anesthesiologist during the procedure. However, accepting as true the allegations made in opposition to the motion for summary judgment *(Capelin Assocs. v Globe Mfg. Corp.,* 34 NY2d 338, 341; *Patrolmen's Benevolent Assn. v City of New York,* 27 NY2d 410, 415; *Cohn v Lionel Corp.,* 21 NY2d 559), we conclude that there is an issue of fact as to whether the actions of Dr. Blaivas were so "intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence" as to support an award of punitive damages *(McDougald v Garber,* 73 NY2d 246, 254; *Montemurro v Dodick,* 160 AD2d 690).

The record contains allegations which, if proved at trial, would tend to indicate that defendant Blaivas abandoned his patient under circumstances which render his conduct "wanton, intentional, reckless and a departure from accepted medical practice" *(Sultan v Kings Highway Hosp. Ctr.,* 167 AD2d 534).* Dr. Curry's deposition testimony indicates that, after the procedure, there was significant bleeding from the Foley catheter and that the patient's blood pressure dropped, requiring fluid management and the administration of vasopressors (Neo-Synephrine and Hespan). Mr. Bens's condition was so unstable that he could not be moved from the operating room to the recovery room for nearly two hours.

According to Dr. Curry, Dr. Blaivas did not examine Mr. Bens to try to ascertain the source of the bleeding but stated to her that the amount of bleeding was not unusual and left. She was obliged to enlist the assistance of a urologist in the adjoining operating room, Mitchell Benson, M.D., to evaluate Mr. Bens's condition. Dr. Benson attempted another cystoscopy, but the spinal anesthetic was wearing off and Mr. Bens did not tolerate the procedure well. As a result, Dr. Benson "stated that he couldn't see anything blatant at that time." Dr. Benson "thought, in his opinion, that this patient should probably go to the main operating area which was on a different floor and have an open operation to find out what was going on." As Dr. Benson had his own patient to attend to, Dr. Curry and Marc Kaplan, M.D., a urology resident present throughout the procedure, were left to cope with the situation.

Excerpts from the hospital record indicate that Mr. Bens's condition remained unstable after he was removed from the

operating room. An entry in the recovery room nurse's notes states that he arrived there at 7:40 P.M. "in shock". "Gross bleeding via Foley catheter" is listed under "complications". The chart of his blood pressure readings shows a range of between 70/30 and 90/40 over the course of the next hour. In direct contradiction to his deposition testimony, both Dr. Curry and Dr. Kaplan assert that Dr. Blaivas never came to the recovery room to determine his patient's condition.

Dr. Kaplan states that he placed a call to Dr. Blaivas at his home in Westchester at approximately 8:30 P.M. to apprise him of the situation. During his examination before trial, Dr. Blaivas was asked whether, at that time, there was a suggestion that he return to the hospital. He replied, "Quite honestly, it's not their job to suggest. We discuss the problem and I make a judgment." Asked what he was doing at home, Dr. Blaivas responded, "I ate dinner, and I'm—I do remember I took a shower." A second telephone call was made by the chief urology resident, Dr. Axelrod, somewhere around 10:00 P.M. Defendant, in his deposition testimony, states that Dr. Axelrod informed him that, in his judgment, Mr. Bens was "bleeding or continuing to bleed very badly and at that time we decided to continue to do the transfusions, and that I was coming in."

It was midnight before Dr. Axelrod and Dr. Blaivas began the procedure which finally stopped the bleeding. By this time, Mr. Bens had received more than 10 units of packed red blood cells. It is plaintiff's theory of recovery that death was caused by severe blood loss resulting from the failure of Dr. Blaivas to stem the bleeding in a timely fashion.

Defendants' motion for partial summary judgment is predicated on the affidavit of defendant Blaivas which differs materially in its presentation of the events recounted by plaintiff and in the inferences to be drawn from the facts. "Upon review of a denial of a defendant's motion for summary judgment, a plaintiff is entitled to every favorable inference which can be reasonably drawn from the evidence" (Sultan v Kings Highway Hosp. Ctr., supra, at 535), and defendant's affidavit, therefore, merely raises a triable issue of fact as to whether punitive damages may be imposed (supra; Montemurro v Dodick, supra).

The dissent resolves factual inconsistencies in favor of defendant Blaivas to conclude that the "only" basis for an award of punitive damages is his delay in returning to the hospital. This is a highly selective reading of the record which overlooks the abandonment of a patient who was unstable—"in shock" according to the hospital record—and exhibiting

"[g]ross bleeding" following surgery, requiring extraordinary measures to maintain marginal blood pressure. Defendant's conduct amounts to a failure to render assistance to a patient in need of emergency treatment, exactly the situation presented in *Sultan v Kings Highway Hosp. Ctr. (supra),* a case the dissent finds "inapposite".

As this court has had occasion to note, "It is well settled that, on a motion for summary judgment, the function of the court is one of issue finding, not issue determination" *(Harris v City of New York,* 147 AD2d 186, 191, citing *Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *Wiener v Ga-Ro Die Cutting,* 104 AD2d 331, *affd* 65 NY2d 732). Only if it can be said, as a matter of law, that punitive damages are unavailable to a plaintiff in a medical malpractice action is a summary determination in favor of defendant warranted on this issue. We are aware of no case which has intimated as much. Nor are we prepared to accept the suggestion advanced by the dissent that punitive damages are only appropriate when the act of "malpractice" is an alleged assault by the treating physician upon his patient *(Mullany v Eiseman,* 125 AD2d 457, 458). Concur—Carro, Ellerin, Kassal and Rubin, JJ.

Murphy, P. J., dissents in a memorandum as follows: I would affirm. The motion court correctly granted defendant's motion for partial summary judgment dismissing plaintiff's claim for punitive damages.

On January 6, 1988, plaintiff's decedent underwent prostate surgery at defendant Columbia-Presbyterian Medical Center performed by defendant Dr. Jerry Blaivas, to correct a chronic urinary obstruction condition. The hospital records indicate that the 71 year old patient had a long history of urethral strictures secondary to gonnorhea. He had undergone multiple urethral dilations in the 1950's. In 1987, an open, suprapubic cystotomy was performed for urinary drainage, which was converted to a Foley catheter inserted directly into the bladder. The Foley catheter had been dislocated to the urethra at the time of admission without any urine output in 24 hours. The patient also had a substantially enlarged prostate, but was otherwise in good health.

Dr. Blaivas performed a transurethral resection of the prostate (TURP) commencing at 3:00 P.M. Dr. Kaplan, a urology resident, was present throughout the procedure and subsequent recovery until 8:00 P.M. and Dr. Curry, an anesthesiologist was present for part of the surgery and during the recovery. She left between 8:00 P.M. and 9:00 P.M. A TURP

involves the insertion through the penis of a tube that permits visual inspection and surgical removal of excess prostatic tissue. The procedure was performed under spinal anesthesia. Dr. Blaivas states that he removed approximately 80 grams of prostate tissue. The operation lasted approximately two hours.

After the operation, the patient's feet were lowered and his blood pressure dropped suddenly, but recovered. Dr. Blaivas concluded at the end of the operation that the amount of bleeding through the Foley catheter was normal and not unusual given the degree of enlargement of the prostate. Dr. Blaivas testified in deposition that he then returned to his office down the hall, leaving Dr. Kaplan and Dr. Curry to monitor and attempt to stabilize the patient.

Dr. Curry testified that she did not recall whether Dr. Blaivas had already left when she returned to the cystoscopy suite after visiting another patient. She testified that she returned just after Mr. Bens's feet had been lowered and she saw Mr. Bens's blood pressure suddenly drop. Dr. Curry then administered a Neo-Synephrine drip to raise the patient's blood pressure and continued to transfuse the patient. Later, at 6:05 P.M., Dr. Curry administered Hespan, a volume expander, in a further attempt to raise his blood pressure.

Dr. Curry observed the amount of blood coming through the Foley catheter and brought it to Dr. Kaplan's attention. She states that he agreed that it was a little more than usual. They decided to consult Dr. Blaivas.

Dr. Blaivas returned to the cystoscopy suite approximately one half hour after the conclusion of the operation, because he was advised of the amount of blood in Mr. Bens's urine. Dr. Curry allegedly told him then that the patient was very unstable and that she thought that there was a problem here. According to Dr. Curry, Dr. Blaivas looked at the bleeding and said that it was no more than was normal, that it was not an unusual occurrence, and that they should not worry about it. Dr. Blaivas testified that he believed that it was usual for such bleeding to occur for about two hours after this type of operation.

Dr. Curry testified that Dr. Blaivas stated that he did not believe that there was a problem and that he was leaving. She then "got upset" with him and asked how he could even think of leaving when she could not even get the patient off the operating table. Nonetheless, Dr. Blaivas again left the operating room with Dr. Kaplan and Dr. Curry in charge.

Accounts differ as to what occurred thereafter. Dr. Blaivas

testified that he again returned to the operating room, and Dr. Kaplan reinserted the cystoscope, and Dr. Blaivas looked through the cystoscope but was unable to identify the source of the bleeding. Dr. Curry testified that Dr. Blaivas did not return again to see the patient until 11:00 P.M. and that she requested Dr. Benson, a urologist attending in an adjacent suite, to consult on the patient's condition. According to Dr. Curry, Dr. Benson attempted to recystoscope the patient, but was hampered by the fact that the anesthestic was wearing off. According to Dr. Curry, Dr. Benson was unable to identify any blatant source of the bleeding, and suggested that the patient should go to the main operating room and undergo an open operation to determine the problem. Dr. Benson submitted an affidavit stating that Dr. Blaivas returned to the suite as he was attempting to recystoscope the patient, and completed the procedure himself. Dr. Kaplan confirms Dr. Blaivas's account that it was Dr. Kaplan who performed the recystoscope. It is unclear from Dr. Kaplan's testimony who else was present.

Dr. Blaivas testified that after being unable to identify the source of the bleeding, he again left the suite with Dr. Kaplan and Dr. Curry in charge. Hospital records indicate that the patient was transferred to the recovery room at 7:40 P.M. with, according to a nurse's entry, "[g]ross bleeding" through the Foley catheter, and in shock. Dr. Blaivas testified that he visited the patient in the recovery room but Dr. Curry says he did not. Dr. Kaplan testified that he did not see Dr. Blaivas in the recovery room. The deposition testimony is unclear as to who was present in the recovery room during the period after 8:00 P.M. Given the approximateness of the times to which they testified, neither Dr. Curry nor Dr. Kaplan's testimony can competently contradict Dr. Blaivas's testimony that he visited Mr. Bens in the recovery room before leaving the hospital at approximately 8:30 P.M.

Dr. Blaivas testified that he thereafter left the hospital to have dinner at home, which is a one-half hour drive from the hospital. He left instructions with Dr. Kaplan to call him and keep him apprised of the patient's condition. Dr. Blaivas further testified that he was in continuous telephone consultation with Dr. Kaplan after conclusion of the operation. Dr. Curry confirms that Dr. Kaplan "was on the phone with Dr. Blaivas regularly explaining to him what was going on." Dr. Kaplan called him at approximately 8:30 P.M. and told him the patient was still bleeding. Dr. Axelrod, the chief urology resident, testified that he came on duty that evening at 8:00

P.M. and relieved Dr. Kaplan. After observing Mr. Bens's condition, Dr. Axelrod called Dr. Blaivas at approximately 8:50 P.M. Dr. Blaivas told him to call again in one hour. Dr. Kaplan called back an hour later, and Dr. Blaivas, after discussing the case with Dr. Axelrod, then decided to return to the hospital. He arrived at 11:00 P.M. and determined that the patient's bleeding had worsened since he had last seen him. At 12:00 P.M. Dr. Blaivas performed a recystoscopy along with Dr. Axelrod, and successfully coagulated the source of the bleeding, which then stopped.

Mr. Bens suffered some additional bleeding during the night and was diagnosed as being acidotic, which is a reduced alkalinity of the blood, for which he was treated. In the morning he suffered a cardiac arrest, was resuscitated, but later that night arrested again and died. It is the position of the plaintiff that the death was a direct result of excessive bleeding following the cystoscopy and the course of treatment with vasopressors and transfusion ordered by Dr. Blaivas.

The only issue on this appeal is whether the record evidence, crediting plaintiff's version where there is a conflict, can support an award of punitive damages against Dr. Blaivas. I would hold that punitive damages are unavailable and inappropriate on this record.

Stripped of dramatic characterization, Dr. Blaivas's alleged breach of duty stemmed from an alleged error in medical judgment, the misapprehension of the severity of Mr. Bens's post-operative bleeding. Regardless of who performed the recystoscopy while Mr. Bens was still in the cystoscopy suite, or whether Dr. Blaivas visited Mr. Bens in the recovery room, or whether he should have left for dinner or returned more quickly, this case involves a choice requiring the exercise of medical judgment. Dr. Blaivas had to decide whether to perform an open abdominal operation to locate the cause of the bleeding or to attempt to maintain the patient's blood pressure and blood oxygen through transfusion and drugs long enough for the bleeding to stop without further intervention. Given the low blood pressure that the patient suffered at the conclusion of the first cystoscopy and his unstable condition, the weighing of risks required an exercise of medical judgment to decide whether to reanesthetize the patient and perform additional surgery or to transfuse the patient and monitor him to see if the bleeding subsides. Mr. Bens's low blood pressure occurred immediately after the prostatic resection and was not a result of the prolonged period of bleeding which plaintiff alleges was the cause of his death. At that

point he had to be maintained on blood pressure raising drugs which plaintiff characterizes as emergency measures, and continuous transfusion.

Dr. Blaivas chose to attempt to maintain and stabilize the patient through transfusion and volume expanders rather than reanesthetize the patient. Maybe this was the wrong choice. Maybe he should have performed open abdominal surgery. Maybe he should have renewed the spinal anesthesia and performed a thorough recystoscopy. Maybe with the low blood pressure problem that followed the last anesthesia, any one of those choices would have had tragic results as well.

The point is that Dr. Blaivas made a medical judgment that may have been negligent. It was not willful, wanton or grossly negligent (see, Spinosa v Weinstein, 168 AD2d 32; Gravitt v Newman, 114 AD2d 1000). Such decisions involving crucial choices in the context of critical care should not have to be made with the threat of punitive damages—the strongest sanction of the civil law—hanging over the physician's head like the sword of Damocles.

Some three hours after the conclusion of the surgery he went home for dinner, one-half hour's drive from the hospital. He asked to be kept informed of the patient's progress. He received three calls, one from Dr. Kaplan and two from Dr. Axelrod. When he was advised in the first call that the patient was still bleeding, he elected to continue with the course of treatment and asked to be called again in one hour. When Mr. Bens's condition had worsened after one hour, he decided to return and assess the patient's condition.

The majority holds that this record presents a factual issue whether defendant's conduct was sufficiently " 'intentional, malicious, outrageous, or otherwise aggravated beyond mere negligence' ", quoting McDougald v Garber (73 NY2d 246, 254) and citing Montemurro v Dodick (160 AD2d 690) as to support an award of punitive damages.

While there are cases that sustain a pleading against a summary judgment motion on the issue of a claim for punitive damages against a physician in a medical malpractice action, we are referred to no case where such an award has been affirmed on appeal in New York. In the McDougald case (supra), relied on by the majority, punitive damages were not in issue, and the statement was purely dicta. In Montemurro (supra), also relied upon by the majority, the Second Department did not state the facts upon which it approved a pleading for punitive damages against a physician. The only other

authority cited by the majority is *Sultan v Kings Highway Hosp. Ctr.* (167 AD2d 534), which involved punitive damages in a wrongful death claim against a hospital for refusing emergency treatment to a cardiac patient in violation of its duty to the public under Public Health Law § 2805-b (4). *Sultan* is inapposite.

That is not to say that in an appropriate case punitive damages should not be available against a doctor in a medical malpractice action. In *Mullany v Eiseman* (125 AD2d 457), the plaintiff suffered a fractured elbow as a result of a scuffle on the operating table between the plaintiff and the defendant physician. The plaintiff was strapped to the operating table in preparation for surgery on a suspected cancerous condition. The plaintiff asked the doctor some questions, was unhappy when the doctor refused to answer, and the patient then revoked his consent. It was held that the doctor's conduct presented a question of fact whether he was grossly negligent or wanton in inflicting injury to the plaintiff.

In *Spinosa v Weinstein* (168 AD2d 32, *supra),* the Second Department reversed a denial of a motion for partial summary judgment and struck the claim for punitive damages. The plaintiff alleged that the defendant, a podiatrist, improperly performed surgery to correct deformities in her foot that left her feet scarred, disfigured, and in constant pain. She further alleged that the doctor broke down the procedure into 34 separate operations over a period of time to maximize its cost. The court held that the allegations of the complaint could not support a claim for punitive damages because they constitute only ordinary negligence or malpractice.

Here, the only conceivable basis for the majority's decision to allow punitive damages is the allegation that Dr. Blaivas delayed his return to the hospital for one hour so that he could have dinner with his wife. Dr. Blaivas's decision not to return to the hospital when he received the first call that Mr. Bens was still bleeding sometime after 8:30 P.M. may not exemplify the highest standard of the profession or satisfy Hippocrates. Indeed a jury might well find that it constitutes malpractice, although the malpractice panel did not so find. However, this decision was not "morally culpable" or "actuated by evil motives" (Bard, New York Medical Malpractice § 26.03e [2]; *Spinosa v Weinstein, supra,* at 42), and therefore does not warrant the imposition of punitive damages to deter others.

Putting aside the melodramatic and hyperbolic characteriza-

tion by plaintiff that the doctor went home to have dinner with his wife while his patient bled to death, the allegations amount to no more than malpractice.