924 A.2d 556

PATRICIA LIGUORI, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF GERALDINE LIGUORI, AND AS EXECUTRIX OF THE ESTATE OF JOHN J. LIGUORI, AND JOHN C. LIGUORI, PLAINTIFFS–APPELLANTS, v. ELIE M. ELMANN, M.D., JAMES B. HUNTER, M.D. AND CARDIAC SURGERY GROUP, P.A., DEFENDANTS–RESPONDENTS, AND PETER PRAEGER, M.D., DIANE ANDERSON, R.N., LYNNANN ANDERSON, R.N., NILO ANTONIO, R.N., SHARON BREADY, R.N., ELLY CALLIAS, R.N., TOM CAREN, R.N., JESSICA CONNERS, R.N., LUCY COVINO, R.N., TERRY DAVOREN, R.N., BETH DRONEY, R.N., KATHY ENRIGHT, R.N., ERIN GIARRUSSO, R.N., LAURA HYNES, R.N., JENNIFER KRAWAIK, R.N., ISELA LAZICKI, R.N., MELANIE LENDIS, R.N., ANNE LOBASSO, R.N., PATRICIA LOPEZ, R.N., LUZ MALIT, R.N., RACHEL MARCHIONY, R.N., BARBARA MARTIN, R.N., CESAR MARTOS, R.N., KELLIE MCGUIRE, R.N., CILA MERRIAM, R.N., WENDY MITCHELL, R.N., PATRICE O'CONNOR, R.N., SUE PATLOCK, R.N., KATHY PAWLOSKI, R.N., JEANNE POLLEY, R.N., PATRICE PULFORIO, R.N., ALICIA QUINN, R.N., ANNIE READIE, R.N., SHEILA RHODES, R.N., DIANE RICHARD, R.N., DEBBIE RODITSKI, R.N., KEVIN ROONEY, R.N., PRATIVA SAHU, R.N., SHEILA SCOLLO, R.N., DONNA SENNA, R.N., GLADYS SILLERO, R.N., JOHN STANTON, R.N., BECKY THUM, R.N., DAWN TRUSIO, R.N., SUE TUDDA, R.N., MARIA VILLALONGO, R.N., TES WELCH, R.N., ALISON WRIGHT, R.N., JANET H. KILROY, R.N., GAIL VANDERHOVEN, R.N., HEATHER CASSIDY, R.N., LUCY XXX, R.N. (LAST NAME FICTITIOUS), STEPHANIE ZZZ, R.N. (LAST NAME FICTITIOUS), ELLEN ZOE, R.N., PATRICE MOE, R.N., ROE BOES 1–10, HACKENSACK UNIVERSITY MEDICAL CENTER, JOHN DOES 1–100 AND ABC CORPORATIONS 1–20, DEFENDANTS.

Argued March 5, 2007—Decided June 25, 2007.

528

*Adam M. Slater* argued the cause for appellants (*Mazie Slater Katz & Freeman,* attorneys; *Mr. Slater and Bruce H. Nagel,* on the briefs).

*Scott T. Heller* argued the cause for respondents Elie M. Elmann, M.D. and Cardiac Surgery Group, P.A. (*Giblin & Combs,* attorneys; *Mr. Heller* and *Eric B. Bailey,* on the briefs).

*Judith A. Wahrenberger* argued the cause for respondent James B. Hunter, M.D. (*Wahrenberger, Pietro & Sherman,* attorneys).

*Dennis J. Alessi* submitted a brief on behalf of amicus curiae, Medical Society of New Jersey (*Mandelbaum Salburg Gold Lazris & Discenza,* attorneys).

Justice HOENS delivered the opinion of the Court.

This appeal calls upon us to consider several issues that are significant to our medical malpractice jurisprudence. First, we consider the dividing line between specialists and general practitioners for purposes of determining the applicable standard of care. Second, we consider the extent to which medical emergencies fall outside the doctrine of informed consent. Third, we consider whether post-surgical communications from a physician

to the members of a patient's family may give rise to a fraud-based cause of action or, in the alternative, to a claim based on lack of informed consent. Finally, we consider whether a discovery violation that inures to plaintiffs' benefit nonetheless entitles plaintiffs to a new trial.

I.

Plaintiffs Patricia Liguori and John J. Liguori are the son and daughter of the decedent, Mrs. Geraldine Liguori. Acting in their individual and representative [1] capacities, they filed their action in the Law Division asserting that Mrs. Liguori's death was caused by medical malpractice. More particularly, they alleged that defendant Dr. James Hunter negligently performed a post-surgical procedure on Mrs. Liguori that eventually led to her death, that he and defendant Dr. Elie Elmann failed to secure informed consent for that procedure, and that Elmann engaged in fraud and misrepresentation in his descriptions to plaintiffs of the post-surgical course of events. Prior to trial, the misrepresentation claim was dismissed and tried as part of the informed consent claim. The matter therefore proceeded to trial against Hunter and Elmann,[2] on the medical malpractice and informed consent theories only. We derive our statement of the facts from the extensive trial record.

The events that gave rise to plaintiffs' claims began on December 9, 1999. On that date, Elmann, a cardiovascular and thoracic

---

[1] At the time of the events in question, Mrs. Liguori was married to John J. Liguori. He died after the events that gave rise to the complaint but before the complaint was filed as a result of which Patricia Liguori sued as the Administratrix Ad Prosequendum of both Mrs. Liguori's estate and John J. Liguori's estate. In addition, she and her brother, Dr. John C. Liguori, sued individually.

[2] The original complaint also named as defendants Elmann's practice group, Cardiac Surgery Group; Hackensack University Medical Center; Elmann's partner, Dr. Peter Praeger; and numerous nurses. Of these, Cardiac Surgery Group remained as a nominal defendant, but the claims against the other defendants were either resolved or dismissed.

surgeon, performed quadruple coronary artery bypass surgery on Mrs. Liguori at Hackensack University Medical Center (HUMC). He was assisted during the surgery by Hunter, who at the time was a cardiac surgery assistant/fellow. That surgery lasted approximately until noon, following which Mrs. Liguori was sent to the cardiac intensive care unit (ICU).

At approximately 2:30 p.m., Patrice Pulford, a nurse in the cardiac surgery ICU, informed Elmann that a chest x-ray revealed that Mrs. Liguori had developed a pneumothorax, a condition commonly referred to as a collapsed lung. Because Elmann was then in the middle of operating on another patient, he told Hunter to attend to Mrs. Liguori. Elmann directed Hunter to assess her status and, if necessary, to insert a chest tube to alleviate the condition. Elmann testified that he warned Hunter to "be careful" because Mrs. Liguori had an enlarged heart.

Hunter immediately left the operating room and quickly arrived at Mrs. Liguori's bedside. He observed that Mrs. Liguori's ventilator was sounding an alarm that indicated to him that there was significant pressure in her airway. At the same time, he detected that she was experiencing respiratory distress as evidenced by the asymmetrical expansion and retraction of her chest. He also noted that she was "bucking the respirator" which he described as being "akin to a big cough." Hunter examined the post-surgical x-ray that had been taken approximately an hour and fifteen minutes earlier.

He testified that he was concerned that Mrs. Liguori had a condition known as "tension pneumothorax," which involves a buildup of air pressure in the chest cavity. That condition, according to Hunter, can cause certain of the organs in the chest, including the heart, to shift. Hunter was concerned because tension pneumothorax can reduce or potentially eliminate blood flow to the heart and can lead to a cardiovascular collapse.

Hunter testified that he determined it would be necessary to insert a chest tube to relieve the tension pneumothorax. He decided that the proper placement of the tube was on the patient's

left side between the sixth and seventh ribs. He could not remember where he had actually inserted the chest tube, but testified that he knew that Mrs. Liguori's heart was enlarged and that he took precautions to avoid injuring it.

According to Hunter, he made a small incision and "dissected down to the chest wall through the adipose tissue." He said that when he reached Mrs. Liguori's ribs, he used a clamp to separate the subcutaneous tissue and to create a hole between the ribs so he could insert the tube. Hunter explained that doctors know when they have reached the chest cavity because there is a sound or feel of air being released. In his words, "you'll know when you're in there and that's the point you stop." He testified that he recalled hearing a rush of air when the clamp was inserted.

According to Hunter, he then inserted his finger into the incision and felt Mrs. Liguori's heart, which was very close to the chest wall. He then slid the chest tube in the cavity over his finger and at an upward angle, embedding the tube into the pleural space and causing Mrs. Liguori's lung to reinflate. He then sutured the tube into place, completing the procedure, which he described at trial as "pretty uneventful."

Hunter recalled that he remained at Mrs. Liguori's bedside for approximately ten, fifteen, or twenty minutes following insertion of the chest tube. He was then "totally satisfied that the tube was functioning [and] that the problem was relieved. There was no evidence whatsoever of bleeding and the blood pressure was stable." He then left the cardiac ICU and returned to the operating room where he began again to assist Elmann with the other patient's surgery.

Hunter testified that he had "absolutely no indication at that time ... that there was anything wrong" with Mrs. Liguori. Two other witnesses at trial, however, cast doubt on Hunter's recollection. According to Pulford, the cardiac ICU nurse, shortly after Hunter inserted the chest tube and while he was still tending to her, Mrs. Liguori's blood pressure dropped, her heart rate increased and her heart began beating abnormally.

Elmann's testimony was also somewhat at odds with Hunter's recollection. During Elmann's pretrial deposition, he testified that when Hunter returned to the operating room after inserting the chest tube, he "looked quite alarmed" and told Elmann that Mrs. Liguori was experiencing "increased bleeding in her drains." At trial, Elmann testified that Hunter had not actually exhibited that reaction when he first returned to the operating room. Rather, Elmann recalled that Hunter came in and out of the operating room several times during the afternoon, suggesting that it was later that Hunter exhibited concern about Mrs. Liguori's condition.

At approximately 3:20 p.m., a few minutes after Hunter had returned to the operating room, a nurse contacted Elmann who was still performing surgery on the other patient. That nurse told him that Mrs. Liguori was experiencing substantial bleeding. Elmann then contacted his partner, Dr. Peter Praeger, a board certified cardiothoracic surgeon, to have Praeger assess Mrs. Liguori's condition. Elmann also instructed Hunter to go back and attend to Mrs. Liguori until Praeger arrived. According to Hunter, he was upset to the point of thinking that he was "going to pass out" but "pulled [him]self together and went back to Mrs. Liguori's bedside."

Within about five minutes of being called, Praeger arrived at the hospital. He evaluated Mrs. Liguori and found that the pleurovac, a collection unit connected to the pericardial tube, which is a tube inserted as a part of the heart surgery, was full of blood and that Mrs. Liguori's blood pressure was very low. Praeger determined that immediate surgery would be required. He then performed exploratory surgery and discovered a hole in the left ventricle of her heart, which he repaired. According to his operative report, Mrs. Liguori "tolerated the procedure well and left the operating room in satisfactory condition." He also noted that the hole in the heart was "related to the insertion of the chest tube." Praeger then advised Elmann about Mrs. Liguori's status.

After Elmann finished operating on the other patient, he examined Mrs. Liguori and drafted his progress notes. That report indicated that the left ventricle injury was related to the chest tube and that it was repaired. At trial, Hunter could not explain how Mrs. Liguori's heart was punctured, although he conceded that it had happened during the chest tube procedure.

Patricia Liguori was in the cardiac waiting room throughout the time of the surgery and the chest tube insertion. Although her brother John Liguori had also been at the hospital for part of the bypass operation, he eventually went to Mrs. Liguori's nearby home while Patricia remained at the hospital. According to Hunter, he would have spoken to the family if he had known they were there and if there had been time. He conceded that "in most situations" patients are asked to sign a consent form before a chest tube is inserted, but that in a situation such as the one he confronted, "in the time that it takes to get consent and everything else, Mrs. Liguori could have easily gone into cardiac arrest." Elmann, Pulford, and the experts who appeared for both plaintiffs and defendants all testified that a collapsed lung that occurs right after surgery constitutes a medical emergency.

At approximately 6:30 p.m., Elmann spoke to both plaintiffs about Mrs. Liguori's treatment. The parties' recollection of the substance of that conversation is sharply in dispute. John Liguori testified that Elmann informed him by telephone that Mrs. Liguori was losing more blood than expected through her tubes after the original surgery and that " '[r]ather than just continue to transfuse blood into her and wait for the clotting to occur, [they] decided to be aggressive and take her back into the operating room.' " According to John Liguori, Elmann also told him that they had found " 'a small bleeder' " and that they had repaired it, commenting that "sometimes these things happen, and she's fine."

Patricia Liguori, who testified that she was listening to the conversation from Elmann's end of the call, had a recollection largely consistent with her brother's. Significantly, according to plaintiffs, Elmann did not tell them about the collapsed lung, did

not reveal that Hunter had inserted the chest tube, and failed to mention that the chest tube had caused the injury to Mrs. Liguori's heart.

Elmann, however, testified that he informed both plaintiffs completely about the chest tube and its complications. According to him, he spoke to Patricia Liguori personally in the waiting room and told her both that Mrs. Liguori had suffered a collapsed lung and that he had not been available to treat it because he was in the middle of a surgery on another patient. He also testified that he told Patricia that because of Mrs. Liguori's condition, the insertion of a chest tube was necessary, but that thereafter she became unstable and required a second emergency surgery. He asserted that he also told Patricia that Praeger had found a small hole and had repaired it.

According to Elmann, Patricia then asked him to telephone her brother John and explain everything to him because John is a physician. Elmann testified that he then had a brief telephone conversation with John in which he repeated the information he had given to Patricia. He recalled telling John that Mrs. Liguori had "bled, she ha[d] a hole in the heart, the apex of the heart was fixed . . . and that she was stable."

Although the specific details of Mrs. Liguori's post-surgical course of care are not germane to the issues we address, she remained in the ICU largely because of complications arising from the laceration to her heart. By early January 2000, her condition had deteriorated and John Liguori met with several of her care-givers to express his dissatisfaction about her treatment.

On January 17, 2000, Dr. Leonardo DiVagno, a cardiologist who was assisting Elmann with Mrs. Liguori's care, spoke to Patricia Liguori. He testified that he described Mrs. Liguori's collapsed lung and the laceration to her heart during the insertion of the chest tube. He also stated that he told Patricia that Mrs. Liguori had sustained a significant amount of bleeding following that event. According to DiVagno, he explained that Praeger had repaired the laceration during the subsequent emergency surgery.

DiVagno testified that Patricia "broke down into tears" and was "very disturbed" by the information he gave her, insisting to him that "no one had told her that." According to Patricia, she was shocked to learn this information from DiVagno and immediately called her brother John for advice. They then transferred their mother to a hospital in North Carolina, where John lived. However, Mrs. Liguori suffered from a series of "cascading complications," resulting in her death from septic shock on February 12, 2000.

## II.

In December 2001, plaintiffs filed their wrongful death complaint, asserting a variety of theories of recovery including medical malpractice, lack of informed consent, battery, and fraudulent misrepresentation.

Following the close of discovery, the trial court granted partial summary judgment in favor of Elmann on plaintiffs' informed consent and agency claims. Thereafter, the trial court granted Elmann's motion to dismiss plaintiffs' claim for fraudulent misrepresentation, converting that claim instead into an informed consent claim. At the conclusion of the evidence, the trial court granted plaintiffs' motion for a directed verdict on causation based on defendants' concession that Mrs. Liguori's death was caused by complications stemming from the laceration to her heart during the chest tube insertion.

The jury returned a verdict in favor of defendants, finding that Hunter did not "deviate from the accepted standard of medical practice in the insertion of the chest tube" and that Elmann did not "fail to obtain the informed consent of the Liguori family to the continued course of treatment." Plaintiffs' motion for a new trial was denied.

Plaintiffs raised thirteen issues on appeal to the Appellate Division, as follows: (1) the fraud claim against Elmann based on post-surgical misrepresentation should not have been dismissed; (2) the trial court erred in converting the fraud claim into an

informed consent claim; (3) the trial court erred in dismissing the negligence claim against Elmann; (4) the informed consent and battery claims should not have been dismissed merely because there was a medical emergency; (5) the defense expert's material change in testimony warranted a new trial; (6) defense counsel's closing argument required a new trial; (7) the trial court erred in charging the jury to hold Hunter to the standard of care applicable to a general practitioner rather than to regard him as a surgeon; (8) the trial court erred in allowing Hunter to testify that he has not changed his technique for inserting a chest tube as a result of the incident; (9) the jury verdict in favor of Hunter was against the weight of the evidence; (10) an anonymous letter should have been admitted into evidence; (11) defense counsel's interruption of plaintiffs' opening with objections required a new trial; (12) defense counsel's interruptions of plaintiffs' summation with objections required a new trial; and (13) the trial court should have excused certain jurors for cause.

In an unpublished decision, the Appellate Division rejected all thirteen arguments and affirmed the jury verdict. One of the Appellate Division judges filed a dissent, which was limited to a single issue. He asserted that the trial judge erred in the jury charge relating to the appropriate standard of care applicable to Hunter in two respects. First, he reasoned that Hunter should have been held to the standard of care applicable to a specialist rather than the one appropriate for a general practitioner. Second, he suggested that, in circumstances where there is doubt about a physician's level of expertise for purposes of the standard of care, the issue should be decided separately by the jury.

Because of the dissent, the question concerning the applicable standard of care is before us as an appeal of right. *See R.* 2:2–1(a)(2). In addition, we granted plaintiffs' petition for certification of four other questions, 188 *N.J.* 485, 909 *A.*2d 721 (2006), relating to informed consent, fraudulent misrepresentation, and discovery of experts.

### III.

In evaluating the standard of care to which Hunter should have been held, we begin with his testimony, in which he described his training and education as well as his responsibilities at HUMC.

### A.

According to Hunter, he graduated from medical school in 1986 and entered a two-year surgical residency program at the University of Medicine and Dentistry of New Jersey (UMDNJ). In 1988, he was licensed as a physician in New Jersey. He had hoped to secure a place in the UMDNJ program as a urology resident, but he was unable to do so. Hunter testified that, although he had already completed the two-year surgical residency program, to become a surgeon, he would have been required to begin his residency anew and complete a different five-year surgical residency program. Instead of doing so, he was offered, and he completed, a third year of residency. He then went to work at Jersey City Medical Center as a "surgery house officer," where he assisted in the operating and emergency rooms, admitted patients, and cared for them after surgery. Hunter testified that his duties included inserting chest tubes, intravenous lines, and arterial lines, as well as performing evaluations and diagnostic procedures of various kinds.

According to Hunter, he was "fascinated" by adult cardiac surgery after first being exposed to it when he was a third-year resident. He testified that he first saw a chest tube insertion when he was a medical student, at which time he was only permitted to observe and assist others. He began participating in chest tube placements when he was a resident and he was able to place chest tubes independently in the second year of his residency. By that time, he had undergone classroom training about the procedure, which he described: "what they call 'didactic' or basic introductory lectures on the proper technique .... we were certainly lectured to in the classroom, versed in the proper anatomy and technique of placing of chest tubes."

Hunter began to work at HUMC as a cardiac surgery assistant/fellow in approximately 1991. He described the duties of that position as follows:

assisting in the open-hear[t] cardiac surgery program, which involves assisting in the coronary artery bypass grafting or CABG, if you will; valve replacements, aortic and mitral valve replacements; assisting in thoracic aneurysms and—and a whole multitude of operations that they perform in the chest and on the heart.

Other responsibilities include taking in-house call, which means you're in the hospital, you sleep in the hospital, you eat in the hospital; fielding calls regarding the questions that the nurses may have about the patients; also performing any procedures that are required either on an emergent or non-emergent or elective basis, if you will. It involves the preoperative workup of the patients, including histories, physical examinations, consenting patients for surgery; any procedures related to any of the previous-mentioned operations such as chest tube placement, arterial line placement, central line placement, and also to be involved in the postoperative management of the patients.

He further explained that when needed, he participates in resuscitating patients who are experiencing cardiac arrest and that on occasion he is even required to "reopen" patients' chests to "assess where the problem is." He is not a board-certified surgeon nor is he eligible to participate in the process of becoming board certified in surgery.

By 1999, when Mrs. Liguori was a patient at HUMC, Hunter had been performing chest tube insertions for approximately thirteen years. He estimated that he had inserted between 100 and 200 chest tubes prior to that time and that none had involved any complications. He was aware, however, that there can be complications relating to the procedure. The major complications, according to Hunter, are insertion on the wrong side of the chest, "actual misplacement" of the tube and "[a]s we know now they, unfortunately, can end up in close proximity to the heart; also any of the great vessels of the chest, meaning the aorta or the vena cava, pulmonary artery, or the lung itself."

Hunter also described his primary responsibilities during Mrs. Liguori's cardiac bypass surgery, explaining that he " 'harvest[ed]' the saphenous vein" from her leg for Elmann's use in bypass grafting and "expose[d] the heart" meaning that he "lift[ed] the heart and turn[ed] it slightly to expose the areas that [were] going

to be bypassed." Finally, Hunter's role was to assist while the surgeon was suturing the grafts of vein to the heart by "maintain[ing] proper tension on the suture so that the ... 'anastomoses,' where the vein is actually sewn to the heart, does not loosen and leak. We have to cut the suture for [the surgeon], anything that he may ask us to do."

### B.

■ The issue about the appropriate standard of care to which Hunter should be held was raised at a charge conference during the trial. Plaintiffs argued that Hunter should be held to the standard of care applicable to a "specialist in the field of surgery" because the procedure he performed was, in fact, a surgical procedure. The trial judge rejected that request. He noted that Hunter's job title was not as a surgeon but only that of an "assistant cardiac surgeon or an assistant cardiac thoracic surgeon fellow." The trial judge further pointed out that all of the witnesses and experts agreed that even a resident would be permitted to insert a chest tube. He therefore reasoned that the appropriate charge to the jury about the standard of care to which Hunter would be held was that of a general practitioner rather than the one relating to specialists.

Nevertheless, in delivering the charge to the jury, the trial court used the language of the charge for a general practitioner, but also referred to Hunter's job title, assistant cardiac surgeon or assistant cardiac thoracic fellow. As a result, he charged the jury as follows:

> The determination whether the defendant, Dr. Hunter, was negligent requires a comparison of the defendant's conduct against a standard of care. If the defendant's conduct is found to have fallen below an accepted standard of care, then he was negligent.
>
> In this case, Dr. Hunter has been described in his profession alternatingly as an assistant cardiac—assistant cardiac thoracic fellow or assistant cardiac surgeon. Therefore, you must decide this case—to decide this case properly, you must know the standard of care imposed by law against which Dr. Hunter's conduct as assistant cardiac surgeon or assistant cardiac thoracic surgeon fellow should be measured.

> Dr. Hunter, in this case, is a general practitioner. A person who is engaged in the general practice of medicine represents that he will have and employ knowledge and skill normally possessed and used by the average physician practicing his profession as a general practitioner. Given what I have just said, it is important for you to know that the standard of care which a general practitioner as an assistant cardiac surgeon or an assistant cardiac thoracic surgeon fellow is required to observe in his treatment of a patient under the circumstances of this case.
>
> Based upon common knowledge alone and without technical training, jurors normally cannot know what conduct constitutes standard of medical practice. Therefore, the standard of practice by which a physician's conduct is to be judged must be furnished by expert testimony. That is to say, by the testimony of persons who by knowledge, training and experience are deemed qualified to testify and to express their opinions on medical subjects. You, as jurors, should not speculate or guess about the standards of care by which the defendant physician, Dr. Hunter, should have conducted himself in the diagnosis and treatment of the deceased plaintiff, Mrs. Liguori.
>
> Rather, you must determine the applicable medical standard from the testimony of the expert witnesses that you have heard in this case.

Plaintiffs assert that Hunter should have been held to the standard of care applicable to a specialist and that the trial judge erred in charging the jury that he was a general practitioner. The dissenting appellate judge agreed. He reasoned that the appropriate standard of care should be determined not, strictly speaking, by how the doctor holds himself out but instead by how it is that the physician "undertakes to act ... and in that sense holds himself out." Using that logic, the dissenter reasoned that because Hunter undertook to act as a surgeon, board certified or not, he should have been held to the specialist's standard of care. Further, the dissenter suggested that our Model Jury Charge is inadequate because it only offers the choice of general practitioner or specialist, and that, in a case such as this one, we should leave to the jury the decision of determining the appropriate standard of care.

### C.

Our Model Jury Charge on medical negligence and standard of care, in relevant part, charges the jury that "[n]egligence is conduct which deviates from a standard of care" and that "[t]he determination of whether a defendant was negligent requires a

comparison of the defendant's conduct against a standard of care." *Model Jury Charge (Civil)* § 5.36A Medical Negligence (March 2002). The charge then explains that defendant is a member of a profession and that "to decide this case properly you must know the standard of care ... against which the defendant's conduct as a [member of that profession] should be measured." *Ibid.* That aspect of the charge is followed by two options, namely, Option A, the instructions concerning specialists, and Option B, the instructions concerning general practitioners.

Each of these options advises the jury that defendant is to be judged, in essence, against others of like skill, training and knowledge. Option A explains that a specialist has a duty "to have and to use that degree of knowledge and skill which is normally possessed and used by the average specialist in that field." *Ibid.* Option B notes that a general practitioner "represents that he/she ... will have and employ knowledge and skill normally possessed and used by the average physician practicing his/her profession as a general practitioner." *Ibid.*

Regardless of which option, specialist or general practitioner, the judge selects, the Model Charge then instructs the jury as follows:

> Given what I have just said, it is important for you to know the standard of care which a general practitioner/specialist in *[insert appropriate specialty description, if applicable]* is required to observe in his/her treatment of a patient under the circumstances of this case. Based upon common knowledge alone, and without technical training, jurors normally cannot know what conduct constitutes standard medical practice. Therefore, the standard of practice by which a physician's conduct is to be judged must be furnished by expert testimony, that is to say, by the testimony of persons who by knowledge, training or experience are deemed qualified to testify and to express their opinions on medical subjects.
>
> You as jurors should not speculate or guess about the standards of care by which the defendant physician(s) should have conducted himself/herself/themselves in the diagnosis and treatment of the plaintiff. Rather, you must determine the applicable medical standard from the testimony of the expert witness(es) you have heard in this case.
>
> [*Ibid.*]

Ordinarily, it is apparent whether a particular physician is a specialist or a general practitioner and the decision about which of

these options to choose is not contested. We have, for example, noted that board certification and eligibility for board certification are considered to be indicators of a doctor's status as a specialist. *See Howard v. Univ. of Med. & Dentistry of N.J.,* 172 *N.J.* 537, 544 n. 1, 800 *A.*2d 73 (2002). But other indicia of a doctor's status may also be found in his or her interactions with the particular patient or will be apparent from the manner in which he or she "holds himself or herself out" to the general public.

This case is perhaps an unusual one, in that Hunter had a position with HUMC that is not itself a recognized specialty, but that might appear, by the description of the role he played and the training he had, to encompass more skill and knowledge than that possessed by a general practitioner. Although Hunter was a doctor who had some training in surgery and was capable of performing some surgical procedures, he plainly was not a surgeon. Faced with this circumstance, the trial judge concluded that Hunter would be held only to the standard of care of a general practitioner. Nevertheless, in charging the jury at trial, he referred to Hunter as a general practitioner and used the general practitioner option, but then, in fact, crafted a hybrid charge. He did so by also stating that Hunter is an assistant cardiac surgeon or assistant cardiac thoracic fellow and by charging the jury that "to decide this case properly, you must know the standard of care [applicable to an] assistant cardiac surgeon or assistant cardiac thoracic surgeon fellow."

The Appellate Division majority concluded that in these circumstances, the general practitioner standard was appropriate because Hunter was not a surgeon and did not hold himself out as a surgeon. More significant, however, to the majority was the undisputed trial testimony, which made plain that chest tube insertion is not a procedure reserved for specialists. For example, Hunter first performed a chest tube insertion when he was still a second-year resident. Even plaintiffs' expert testified that he had taught the procedure to residents.

In a medical malpractice trial in which the standard of care is contested, the jury must decide what the standard of care requires as well as whether the doctor deviated from that standard of care. The function of the charge is to explain to the jury that a physician is held to a standard of care and to advise the jury about its duty to evaluate the expert testimony about what the standard of care requires. Even were we to agree with the dissenting judge that Hunter should have been held to a standard of care other than that of a general practitioner, we would conclude that there was no reversible error here.

In this case, although the charge differentiates between general practitioners and specialists, there was no significant debate about the standard of care to which any physician who attempts to insert a chest tube should be held. Rather, the debate was about whether Hunter performed the procedure as he said he did, in compliance with the applicable standard of care, or whether he deviated from that standard, directly causing the injury to Mrs. Liguori's heart. The jury was not misled about that debate nor were they misinformed by the judge's reference to Hunter's job description during the charge. Therefore, the trial judge's effort to span what he perceived to be a gap in the Model Charge by referring to Hunter's job title, while not entirely in keeping with the Model Charge, nonetheless did not result in error. In this matter, we need not answer the broader question raised in the dissent regarding the manner in which physicians may be seen as holding themselves out in order to conclude that the charge did not unfairly suggest that Hunter be held to an inappropriate standard of care.

## IV.

We granted plaintiffs' petition for certification, in which they raised four additional issues to which we now turn.

## A.

Plaintiffs contend that the trial court erred in dismissing their informed consent and battery claims, to the extent that those

claims were based on Hunter's insertion of the chest tube without first seeking their permission. In granting defendants' motion to dismiss those counts of the complaint, the trial court reasoned that plaintiffs' consent was not required because Mrs. Liguori's condition presented defendants with a medical emergency. The Appellate Division agreed, reasoning that the undisputed evidence demonstrated that the patient's condition placed her life in immediate jeopardy, thus making it unnecessary for Hunter to attempt to secure plaintiffs' consent to the procedure.

Plaintiffs characterize this aspect of the Appellate Division's analysis as holding that there is never a duty to seek consent in a medical emergency. They urge us to conclude that in so holding, the court deviated from our decision in *Perna v. Pirozzi*, 92 *N.J.* 446, 457 *A.*2d 431 (1983). Plaintiffs contend that by rejecting their informed consent claim, the trial court and the Appellate Division created a new rule of law, obviating the need to seek informed consent even in circumstances where it would have been possible to secure it. They suggest that we should instead adopt a rule of law that would require physicians to secure consent, even in the context of a medical emergency, unless it is "truly impossible" and urge us to conclude that the record here does not support dismissal of their claim under that theory. We, however, disagree with plaintiffs' reading of the Appellate Division's decision and its implications.

In 1989, our Legislature enacted a statutory patient "bill of rights" providing protections for hospital patients. *See N.J.S.A.* 26:2H–12.8. In relevant part, that statute provides that hospital patients have the right to "receive . . . information necessary to give informed consent prior to the start of any procedure or treatment . . . except for those emergency situations not requiring an informed consent." *N.J.S.A.* 26:2H–12.8d. That statute is consistent with our case law that recognizes the existence of an exception to the informed consent doctrine for medical emergencies.

In *Perna, supra,* which preceded the enactment of this legislation, we considered the scope of a patient's right to give informed consent and we held that it is an act of battery for a surgeon to operate without consent. *See* 92 *N.J.* at 461–62, 457 *A.*2d 431. In determining that a patient's consent, given to a particular physician, did not extend automatically to two of that physician's partners, we observed that "[a]bsent an emergency, patients have the right to determine not only whether surgery is to be performed on them, but who shall perform it." *Id.* at 461, 457 *A.*2d 431; *see also Samoilov v. Raz,* 222 *N.J.Super.* 108, 113, 536 *A.*2d 275 (App.Div.1987) (noting that patients have the right to decide whether surgery will be performed "[a]bsent an emergency").

Although some emergencies might well present physicians with sufficient time to seek consent, we decline to adopt plaintiffs' rigid formulation of the circumstances in which their failure to do so would be permissible. Nor, for that matter, need we generally address the scope of the emergency exception to the informed consent doctrine in the context of this appeal.

Both plaintiffs' and defendants' experts agreed that the circumstances Hunter confronted constituted a medical emergency. Both agreed that Mrs. Liguori's condition required the insertion of a chest tube. Although plaintiffs point to the amount of time that passed after Hunter was sent to evaluate her and before he inserted the chest tube, and suggest that there was enough time for him to seek consent, the record reflects that the jury considered this argument and disagreed. We are satisfied, based on our review of the record, that the jury concluded that Hunter's actions were reasonable in light of all of the facts relating to the emergency he confronted.

### B.

Plaintiffs also urge us to recognize a separate cause of action against Elmann sounding in fraud and arising from what plaintiffs characterize as his post-surgical misrepresentations. Arguing that our most recent discussion about causes of action for

fraud in the context of medical malpractice left this question unanswered, *see Howard, supra,* 172 *N.J.* at 544, 800 *A.*2d 73, plaintiffs contend that the trial court and the Appellate Division erred in limiting plaintiffs to a cause of action sounding in informed consent.

The essence of plaintiffs' claims relating to a fraud theory rest on their assertions regarding what Elmann said about the chest tube and the events that followed its insertion. They assert that he only told them that Mrs. Liguori had suffered from a "small bleeder" after the completion of the bypass. As such, they contend, he did not tell them about the collapsed lung, the insertion of the chest tube, or the injury to her heart during the chest tube insertion, and failed to mention the involvement of either Hunter or Praeger in her care. Plaintiffs assert that these facts constitute post-surgical misrepresentations consistent with a fraud-based cause of action.

In *Howard, supra,* we recognized that a patient generally has three avenues for relief against a physician, namely, "(1) deviation from the standard of care . . .; (2) lack of informed consent; and (3) battery." 172 *N.J.* at 545, 800 *A.*2d 73. We there declined to create a "novel fraud or deceit-based cause of action" arising from a doctor's pre-treatment misrepresentation about his professional qualifications. *See id.* at 553, 800 *A.*2d 73. We did not address the potential for a post-surgical fraud claim. As a part of our analysis, however, we cited a New York decision addressing the circumstances in which a fraud claim might arise. *See id.* at 553–54, 800 *A.*2d 73 (citing *Spinosa v. Weinstein,* 168 *A.D.*2d 32, 571 *N.Y.S.*2d 747 (App.Div.1991)). In *Spinosa, supra,* the New York court reasoned that a fraud claim can only arise " 'when the alleged fraud occurs separately from and subsequent to the malpractice . . . and then only where the fraud claim gives rise to damages separate and distinct from those flowing from the malpractice.' " 571 *N.Y.S.*2d at 753 (quoting *Coopersmith v. Gold,* 172 *A.D.*2d 982, 568 *N.Y.S.*2d 250, 252 (App.Div.1991)). Our reference to that decision in *Howard, supra,* 172 *N.J.* at 553–54, 800 *A.*2d 73, illustrated the reasoning of a sister state which had also rejected

the creation of a new fraud based claim in a medical malpractice case.

We see nothing in this record that suggests that we should now deviate from our careful analysis in *Howard*. The claims raised against both Elmann and Hunter are based on asserted lack of informed consent and deviations from the applicable standard of care. The harms suffered by Mrs. Liguori cannot be separated from the insertion of the chest tube, regardless of what Elmann did or did not say about those events. Therefore, we find no error in the trial court's dismissal of the fraud claim or in the Appellate Division's analysis of plaintiffs' argument on appeal.

## C.

Plaintiffs also contend that the trial court erred in converting their fraud claim into a separate claim based on a lack of informed consent, and that the Appellate Division erred in failing to reverse that decision. More specifically, plaintiffs assert that there was no relationship between Elmann's alleged misrepresentations and any request for informed consent and that the trial court therefore presented the jury with no basis on which it could return a verdict in their favor.

As the Appellate Division correctly concluded, plaintiffs' claim against Elmann relating to what he did or did not say after the insertion of the chest tube and the surgical repair is in reality an argument that they were not given sufficient information on which they could decide whether or not to permit defendants to proceed to care for Mrs. Liguori. Seen in that light, the claim is indeed one arising out of an asserted lack of informed consent. Reasoning in the alternative, however, the Appellate Division concluded that even were the claim more appropriately cognizable as being in the nature of a deviation from the standard of care, the jury plainly believed Elmann's testimony that he advised plaintiffs of all of the events that had transpired, including Hunter's involvement and Praeger's repair. We agree that the trial court properly converted plaintiffs' fraud claim into a lack of informed consent

claim. Therefore, even were we to find some merit in plaintiffs' theoretical argument, we would find no ground on which to reverse the verdict.

### D.

■ Finally, we address plaintiffs' assertions that they were deprived of a fair trial because they were not alerted in advance of trial to a change in the causation opinion that would be offered by defendants' expert.

Although the precise details of the testimony are not germane to our discussion, we summarize the facts that gave rise to the dispute for the sake of completeness. In his deposition testimony, defendants' expert, Dr. Richard Kline, opined that the injury to Mrs. Liguori's heart could have been caused in one of two ways. He believed that, if she had developed a tension pneumothorax, her heart would have shifted inside of the chest cavity, with the result that when Hunter inserted the clamp as a part of the chest tube insertion, her heart would have suddenly shifted back, causing her heart to strike the clamp and be damaged. In the alternative, he believed that the insertion of the clamp during the procedure to insert the chest tube could have directly damaged the heart. Approximately two weeks prior to trial, Dr. Kline advised counsel for defendants that he believed that the injury was caused by the clamp. In effect, this change in his testimony brought his view about causation directly into alignment with the views of plaintiffs' expert. Ultimately, defendants conceded on causation, resulting in a directed verdict on that issue. It is in this context that we consider the arguments raised on appeal relating to defendants' violation of the discovery rules.

■ We have previously reiterated the underlying purposes of our discovery rules. "The discovery rules 'were designed to eliminate, as far as possible, concealment and surprise in the trial of law suits to the end that judgments therein be rested upon the real merits of the causes and not upon the skill and maneuvering of counsel.' " *Wymbs v. Twp. of Wayne,* 163 *N.J.* 523, 543, 750

A.2d 751 (2000) (quoting *Evtush v. Hudson Bus Transp. Co.*, 7 *N.J.* 167, 173, 81 *A.*2d 6 (1951)). Further, "[l]awyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel." *McKenney v. Jersey City Med. Ctr.*, 167 *N.J.* 359, 371, 771 *A.*2d 1153 (2001). Thus, defense counsel has an "obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony." *Ibid.* This Court has explained that, "[f]or plaintiffs to proceed to trial without being informed of the surprise testimony created a 'make believe scenario [for plaintiffs], the legal equivalent of half a deck.' " *Id.* at 375–76, 771 *A.*2d 1153 (alteration in original) (internal quotation omitted) (quoting *Buckley v. Estate of Pirolo*, 101 *N.J.* 68, 79, 500 *A.*2d 703 (1985)).

We do not retreat from the views we have previously expressed about the significance of a failure to abide by the requirements of our discovery rules. In this case, however, the record discloses that the change in the expert's opinion, although significant, was one which brought his opinion into alignment with plaintiffs' expert. That is to say, although the opinion he offered was a change from the view he expressed in his deposition, it was, in the end, an acknowledgment that plaintiffs' expert's opinion on how the injury to Mrs. Liguori's heart was caused was correct. We do not perceive, in these circumstances, any prejudice to plaintiffs.

V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.