NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

-------------------------------------------------------x

| | | |
|---|---|---|
| TOWNSHIP OF ALEXANDRIA, | : | |
| | : | TAX COURT OF NEW JERSEY |
| Plaintiff, | : | DOCKET NO: 008302-2022 |
| | : | |
| v. | : | |
| | : | |
| LATTER HOUSE OF GLORY, INC., | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------x
-------------------------------------------------------x

| | | |
|---|---|---|
| LATTER HOUSE OF GLORY, INC., | : | |
| | : | TAX COURT OF NEW JERSEY |
| Plaintiff, | : | DOCKET NO: 007294-2023 |
| | : | |
| v. | : | |
| | : | |
| TOWNSHIP OF ALEXANDRIA, | : | |
| | : | |
| Defendant. | : | |

-------------------------------------------------------x

Decided April 1, 2025.

Kevin A. McDonald for Alexandria Township (DiFrancesco, Bateman Coley, Yospin, Kunzman, Davis, Lehrer & Flaum, PC, attorneys).

Christopher John Stracco for Latter House of Glory, Inc. (Day Pitney LLP, attorneys).

Kenneth A. Porro for Latter House of Glory, Inc. (Chasen, Lamparello, Mallon & Cappuzzo, PC, attorneys)

CIMINO, J.T.C.

The taxpayer, Latter House of Glory, Inc., seeks an exemption from local property taxes for a property located at 455 Mechlin Road, in the Township of Alexandria, County of Hunterdon. From outward appearances to a casual observer, the property is a decent sized residential ranch home located on 1.6 acres of land. The municipality denied the exemption and the taxpayer appealed. The municipality wants to subpoena certain bank records. The taxpayer objects, citing First Amendment grounds and claiming the municipality has no basis for the request. The municipality presents evidence the church has been used to foster illegal activities and the property has been used for profitable endeavors. The court grants the motion.

Discovery is an important part of the litigation process allowing the parties to flesh out the facts and legal issues of a case. Liguori v. Elmann, 191 N.J. 527, 550-51 (2007). To that end, discovery is liberally and broadly construed. "Generally, we seek to afford every litigant who has a bona fide cause of action or defense the opportunity for full exposure of his case." Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193 (1988). "The discovery rules are also designed to insure that the ultimate outcome of litigation will be dependent on the merits of an individual matter in light of all the available facts. Resolution of a case should not hinge upon the craftiness of the parties or the guile of their counsel." Shanley & Fisher, P.C. v.

2

Sisselman, 215 N.J. Super. 200, 216 (App. Div. 1987) (citing Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338 (1951)). Discovery is permitted not only of relevant evidence, but also evidence that will lead to relevant evidence. R. 4:10-2(a); Pfenninger v. Hunterdon Cent. Reg'l High Sch., 167 N.J. 230, 237 (2001).

In opposing the motion, the taxpayer essentially urges this court to accept taxpayer's certified answers to interrogatories, certifications, and other evidence as established fact. It would certainly be reversible error for this court to weigh the evidence and make credibility determinations at this stage of the litigation. Establishing whether further discovery is warranted is more akin to the procedure utilized on a motion to dismiss. "The invocation of that procedure requires a judge to accept the pleader's factual allegations as true and give the pleader the benefit of all reasonable inferences." Woodmont Props., LLC v. Township of Westampton, 470 N.J. Super. 534, 540 (App. Div. 2022) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)).

The municipality has set forth a number of allegations as to why it is entitled to further discovery. In opposing these allegations, the taxpayer claims the allegations are not supported by the certified discovery answers provided by the taxpayer. Once again, now is not the time to weigh the evidence. For the sole purpose of seeking further discovery, this court accepts the good faith allegations of the municipality. While not necessary, the municipality is able to point to evidence

3

already obtained to support its position. Whether this discovery is ultimately admissible is not the point. The municipality must have the fair chance to explore the areas of concern it raised.

Catherine Pennetta, Christopher Pennetta, and Theresa Guzzo reside at the property. Christopher Pennetta and Catherine Pennetta are married. Theresa Guzzo is the aunt of Catherine Pennetta and raised Catherine Pennetta after her mother died.

According to evidence from the Hunterdon County Prosecutor, in October, 2013, Ms. Guzzo sold her house in North Arlington for $484,000. Thereupon, the property at issue was purchased for $442,000. However, the property was not titled in the name of Guzzo or the Pennettas. Rather, the property was titled in the name of Latter House of Glory, Inc., a New Jersey not-for-profit. Catherine Pennetta is the contact for Latter House of Glory, Inc.

Christopher Pennetta applied to the Hunterdon County Division of Social Services for temporary rental assistance in 2014. To support his application, he provided a lease between himself and Latter House of Glory, Inc. Over a period of many months, rental assistance checks in the amount of $1,163 per month were remitted to the Latter House of Glory, Inc. In addition, both Christopher and Catherine Pennetta applied for and received food stamps and Medicaid. It seems that Christopher Pennetta was claiming that his only source of income was from Supplemental Security Income (SSI). SSI is not to be confused with Social Security

4

Disability Income even though both can provide benefits for disabled individuals. Unlike Social Security Disability Income, SSI is not based upon past earnings, but is a means-tested program based upon assets and other income. See Burns v. Edwards, 367 N.J. Super. 29, 36-38 (App. Div. 2004).

Despite claims of being unable to work, the Prosecutor's Office surveilled Christopher Pennetta working on various construction jobs operating power tools and moving heavy equipment and furniture. Surveillance of the property revealed a trailer with "Pennetta Property Management" emblazoned on the side. The Prosecutor's office obtained a number of invoices for contracting work performed in the name of "Pennetta Contracting" listing the address of the property.

The New Jersey Division of Taxation later found the Pennettas had total income in 2014 of $163,279 which includes $30,671 in government benefits. For 2015, the Pennettas received $39,164 in benefits and had a total income of $123,798. The Pennettas later pled guilty to theft and were ordered to pay restitution of $70,000. This is not Christopher Pennetta's first conviction for a crime of dishonesty. Prior convictions include theft, N.J.S.A. 2C:20-3; taking by means of conveyance, N.J.S.A. 2C:20-10(a); wrongful impersonating, N.J.S.A. 2C:21-17(a)(1); burglary, N.J.S.A. 2C:18-2; and receiving stolen property, N.J.S.A. 2C:20-7.

The Pennettas indicate they lied in the Superior Court criminal action when they admitted operating a construction business while collecting social welfare benefits. They seem to blame their criminal attorney for advising them to commit this alleged act of perjury. In certifications to this court, the Pennettas allege they "were advised to say that we had operated a business, despite the fact that it was not true."

Numerous neighbors have certified that lawn equipment such as lawnmowers and other equipment for sale at the property. The Latter House of Glory, Inc. records provided so far show payments to Tractor Supply, Rock Auto, NAPA, L&L Lawn & Garden Equipment, Advance Auto, North East Parts, Steiner Tractor Parts and Harbor Freight. Other expenses of the Latter House of Glory, Inc. are to QVC, Walmart, Shop-Rite and various restaurants.

The Pennettas claim to operate another not-for-profit on the property by the name of Crossroads Community Outreach, Inc. The purported purpose of this organization is an animal rescue. To that end, certain pet supplies are part of Latter House of Glory's expenses.

The mode of discovery which the municipality desires to pursue is the issuance of subpoenas for the bank records of the Pennettas, Guzzo, Latter House and Crossroads Community Outreach. Taxpayer asserts that the First Amendment to the United States Constitution grants broad immunity from examination of its

6

financial affairs. Previously, this court narrowed the scope of financial discovery to determine if a voluntary disclosure of evidence directly from Latter House only would suffice. The prior ruling left the door open to further discovery if the information proved insufficient.

Both parties moved for summary judgment. Despite the voluminous information provided via the parties' cross-motions for summary judgment, the financial records provided are scanty. The court invited the parties to revisit the propriety of subpoenaing financial records to ensure a complete record before ruling upon the motion. Sua sponte review of prior interlocutory orders is appropriate so long as the parties are apprised and have notice and opportunity to be heard. Lombardi v. Masso, 207 N.J. 517, 522, 537 (2011). The court asked the parties to address the propriety of subpoenas for the banking records of Latter House, Community Crossroads, the Pennettas and Guzzo. The court also asked the parties to address the additional time frame of 2023 and 2024 since the prior subpoenas were issued in 2022. "Th[e] special power afforded to judges over their interlocutory orders derives from the fact that cases continue to develop after orders have been entered and that judges likewise continue to think about them." Id. at 536.

In the federal courts, when First Amendment defenses to financial discovery sought by the Internal Revenue Service (IRS) are raised, the starting point is usually the four criteria addressed in United States v. Powell, 379 U.S. 48, 57-58 (1964).

7

See, e.g., Sturman v. United States, 538 F. Supp. 3d 962, 965-66 (N.D. Cal. 2021); Speidell v. United States, 978 F.3d 731, 737-38 (10th Cir. 2020). In Powell, the propriety of a summons issued by the Commissioner of Internal Revenue was at issue. Id. at 49. The Commissioner of Internal Revenue is empowered to issue summonses to obtain financial documents. I.R.C. § 7602. Like a subpoena, a summons can be challenged through a court proceeding. I.R.C. § 7604.

"The good faith of the IRS in issuing a summons is tested by four criteria set out in Powell: the IRS must show (1) that the investigation will be conducted pursuant to a legitimate purpose; (2) that the inquiry may be relevant to the purpose; (3) that the information sought is not already in the possession of the IRS; and (4) that the administrative steps required by the Internal Revenue Code have been followed." United States v. Freedom Church, 613 F.2d 316, 319 (1st Cir. 1979).

Powell rejected the notion that the IRS must show the existence of probable cause for issuance of the information sought.[1] Powell, 379 U.S. at 51. Powell's

---

[1] In 1969, Congress added I.R.C. § 7605(c) to protect churches from the administrative burden of unnecessary tax audits that would interfere with the financial matters of the church. United States v. Grayson Cnty. State Bank, 656 F.2d 1070, 1075, (5th Cir. Unit A 1981); Tax Reform Act of 1969, Pub. L. No. 91-172, § 121(f), 83 Stat. 487, 548. That provision required not merely a good faith pursuit but only allow information to the "extent necessary." Ibid. The code was amended again in 1984 to create a specific section regarding church audits. Tax Reform Act of 1984, Pub. L. No. 98-369, § 1033(a), 98 Stat. 494, 1034. I.R.C. § 7611(b)(1). This new section also utilized the "extent necessary" standard. However, Section 7611 does not apply to third-party subpoenas issued under Section 7609. United States v. C.E. Hobbs Found. for Religious Training and Educ., Inc., 7 F.3d 169, 173

8

interpretation of a federal statute is not binding upon New Jersey's subpoena rule. See R. 1:9-2. However, in light of the First Amendment concerns raised, the court will apply Powell.

Determining whether a property qualifies for a tax exemption is a legitimate purpose satisfying the first of the Powell criterion. The second Powell criterion, which is the most important here, is whether the inquiry may be relevant. In New Jersey local property tax exemption cases, two relevant factual inquiries frequently arise. First, can the profit be traced into someone's personal pocket. Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 522 (1984). Second, whether there is excessive commingling and entanglement of not-for-profit and for-profit activities and operations. Int'l Schs. Servs., Inc. v. Township of West Windsor, 207 N.J. 3, 25 (2011). Either is fatal to a tax exemption application. Evidence tending to prove or disprove either is certainly relevant. Banking records provide an objective means of answering both inquiries.[2]

Here, there are allegations that the church has been used as a vehicle to launder and improperly obtain government support payments. Taxpayer counters that there

---

(9th Cir. 1993). In any event, federal sections 7605, 7609 or 7611 are not applicable to this state action.

[2] Parenthetically, whether property qualifies for the not-for-profit exemption under N.J.S.A. 54:4-3.6 requires consideration of three prongs, namely, the organization, use and profit prongs. Int'l Schs. Servs., 207 N.J. at 16. The use and profit prongs are often interwoven and considered in tandem. Id. at 17.

is no proof of this occurring during the tax years at issue, yet it seeks to block disclosure of complete financial records by challenging the subpoenas. There are allegations of commercial activities taking place on the property, namely a home remodeling business and the sale of lawn mowers and other equipment. Some of the records provided already indicate the church made a number of expenditures to places such as Tractor Supply and auto parts stores, arguably to repair the lawn equipment before sale.

The Pennettas assert they lied to the Superior Court when they entered their pleas admitting a business was conducted at the property. Obviously, the operation of a business led to the disqualification of the Pennettas from both federal and state social welfare benefits. Taxpayer asserts business activities did not take place during the relevant tax years, but challenges the subpoenas which would provide further financial information. It is unclear whether the proceeds of the lawn equipment sales, remodeling business, or other sources are being placed into the church account. And there is the subsidiary question whether any funds placed in the church account are utilized to: (1) directly avoid income taxation; or (2) indirectly avoid income tax in the form of a charitable deduction.

There is also a question of whether church expenditures support individual living expenses. There are numerous payments to QVC, which is commonly known

as a television channel which sells various fashion and home products. The taxpayer claims the QVC expenses are church related.

There are further questions regarding intermingling of the church and Pennetta funds. A review of the meager financial records provided so far seem to indicate that only some expenses are being paid for by the church. Interestingly enough, the church records do not reveal payment for the utilities serving the property.

Certainly, the records of the Pennettas and Guzzo have a bearing as to whether there is an impermissible commingling and entanglement of the financial affairs of the church and the individuals. The financial records may also reveal whether profit, either from the church or use of the property, can be traced into someone's personal pocket. The financial records may or may not be fully dispositive of the issue of whether an exemption should be granted, but the records are certainly relevant to the inquiry. The more detailed records will reveal any interlocking financial relationship among the individuals, their various enterprises and the church. Financial records will clarify whether or not the church is being used as either a sink for income earned in the enterprises or a fund for payment of individual expenses. From the records of the church provided so far, there appears to be transfers back and forth between other accounts.

11

The taxpayer has the burden of proof. While the taxpayer is entitled to a full exposition of its case, that comes with certain responsibilities including providing discovery so the municipality, on behalf of all the other taxpayers, is assured any exemption is proper. At the end of the day, it cannot be disputed that the information sought is relevant to determine the tax exemption of the property. The taxpayer expects the court to accept the word of the Pennettas without having to produce proof that the prior conduct which lead to their indictments is no longer occurring. The taxpayer is not being asked to prove a negative. Rather, the taxpayer must show the property is devoted to a legitimate not-for-profit purpose.

As to the third Powell criterion, the information sought is not already in the possession of the municipality. The bank statements of just the church do not provide a full picture considering the evidence of numerous other activities on the property. To get better clarity, the records of all entities and individuals benefitting from the property are necessary.

As to the fourth Powell criterion, the proper administrative steps have been followed. This comes before the court on a motion for reconsideration, the proper method of resolving this issue. Overall, this court determines that the subpoenas issued by the municipality for the bank records of both the church and the individuals is a good faith pursuit of the determining whether the property is indeed exempt from taxation.

12

However, there is still the issue of whether the municipality's pursuit of financial records constitutes an impermissible entanglement of church and state. The First Amendment protects religious expression by mandating "Congress shall make no law respecting an establishment of religion, . . . ." [3] U.S. Const. amend. I. "[T]he Establishment Clause prohibits states from promoting religion or becoming too entangled in religious affairs . . . ." [4] McKelvey v. Pierce, 173 N.J. 26 40-41 (2002). The gist of the taxpayer's argument is the municipality – through its subpoenas – is becoming too entangled in the affairs of the taxpayer.

The New Jersey Supreme Court's recent decision in Hyman v. Rosenbaum Yeshiva of North Jersey, 258 N.J. 208 (2024) explicitly confirms McKelvey is still controlling for determining Establishment Clause issues.[5] Hyman, 258 N.J. at 216.

---

[3] The First Amendment also has a Free Exercise Clause which guarantees the freedom to believe and to act upon such beliefs. McKelvey v. Pierce, 173 N.J. 26, 40 (2002). There is not any allegation that the municipality is trying to shut Latter House of Glory down. Rather, the concern raised by Latter House is the municipality is overstepping the Establishment Clause by excessively entangling itself in the financial affairs of the church.

[4] New Jersey also has an Establishment Clause in its Constitution. However, the New Jersey Supreme Court has recognized that it "is less pervasive, literally, than the federal provision." Resnick v. East Brunswick Bd. of Educ., 77 N.J. 88, 104 (1978). N.J. Const. art. I, ¶ 4.

[5] The Court did modify McKelvey slightly to recognize intervening decisions of the United States Supreme Court. Hyman, 258 N.J. at 216. However, those modifications do not impact the issue now before this court.

13

McKelvey recognizes "[t]he oft-cited Lemon test for determining whether a particular government action passes muster under the Establishment Clause[. The test] requires that it must (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive government entanglement with religion." McKelvey, 173 N.J. at 41 (citing Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971)). The first two prongs are not in serious contention in this case. First, the proper administration of a tax exemption for real property is certainly a secular purpose. Second, the primary effect of properly determining tax exemptions neither advances, nor inhibits religion.

As in most cases, including this one, the third prong, entanglement, is at issue. There are "two dimensions of entanglement under the Establishment Clause: substantive and procedural entanglement." McKelvey, 173 N.J. at 41. "Substantive entanglement involves the same concerns as the Free Exercise Clause analysis and may occur, for example, when a church's freedom to choose its ministers is at stake." McKelvey, 173 N.J. at 42. "Procedural entanglement, on the other hand, might result 'from a protracted legal process pitting church and state as adversaries.'" McKelvey, 173 N.J. at 42 (quoting Rayburn v. General Conference of Seventh-Day Adventists, 772 F.2d 1164, 1171 (4th Cir. 1985)). Here, the issue to be examined is procedural entanglement.

14

"Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." McKelvey, 173 N.J. at 43 (quoting Agostini v. Felton, 521 U.S. 203, 233 (1997)). For example, there is not excessive entanglement where a State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion. McKelvey, 173 N.J. at 43 (citing Roemer v. Bd. of Pub. Works, 426 U.S. 736, 764-65 (1976)). "[T]he First Amendment does not immunize the church from all temporal claims made against it." McKelvey, 173 N.J. at 46. Churches are "not above the law." Id. at 54.

"Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury." Cantwell, 310 U.S. at 306. As stated long ago by the United States Supreme Court in Cantwell, "[n]othing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public." Ibid. This is not to say or imply the Pennettas have committed any fraud upon the public. However, the municipality is certainly entitled to raise the issue that a church is a conduit to improperly obtain governmental benefits and advantages.

15

Tax exemptions are carefully reviewed to maintain the public's interest of everyone paying their fair share. Tax exemption statutes are subject to strict construction, since the granting of a tax exemption spreads the tax burden upon the remaining taxpayers in the taxing district. The public needs to be assured that determinations of taxability are made accurately so as to maintain public confidence in our taxing regime. To grant an exemption solely upon someone's word that a religious exemption is appropriate would undercut the public's confidence and would serve as an invitation for mischief by unscrupulous taxpayers trying to avoid paying their fair share. The court needs more information to make a determination whether or not taxpayer is conducting a legitimate not-for-profit operation at the property.

Taxpayer has cited two cases decided by the First Circuit in 1979 which flesh out the considerations when a governmental entity seeks financial records from a religious institution. These two decisions have been cited by a number of other courts across the nation as well as in treatises and law review articles. The first, Surinach v. Pesquera De Busquets, 604 F.2d 73 (1st Cir. 1979) was decided on July 25, 1979.

The Commonwealth of Puerto Rico established a Department of Consumer Affairs launching investigations into the costs of private schools operating in the Commonwealth. Id. at 74. The Department ordered The Inter-Diocesan Secretariat

16

for Catholic Education of Puerto Rico to provide financial records for the parochial schools.  Id. at 74.  While the court recognized that the Department had a mandate to combat inflation, the court also recognized that the financial records would be utilized to dictate how the schools operate and "which costs are necessary and reasonable."  Id. at 77.  For example, the Department could perhaps determine the teacher to student ratio is too low despite the Bishop and superintendents deciding that small classes of students are vitally important for sustained and personal contact between a pupil and his religious mentor that they deem necessary to the mission of the church.  Id. at 77.  The court found that the Department having the financial records would "permit it to intrude upon decisions of religious authorities as to how much money should be expended and how funds should best be allotted to serve the religious goals of the schools."  Id. at 79.  As a result, the court found excessive entanglement and enjoined the Department from seeking the records.  Id. at 80.

In the case now before the court, the municipality does not seek the records in order to regulate the affairs of the taxpayer.  Rather, the municipality seeks the records to determine whether the taxpayer is entitled to a tax exemption.  Thus, the holding in Surinach is inapposite.

On December 28, 1979, the First Circuit decided the case of United States v. Freedom Church, 613 F.2d 316 (1st Cir. 1979).  The Internal Revenue Service sought financial records from the pastor of Freedom Church while pursuing a tax

17

liability investigation of the church. Id. at 318. Through the issuance of a summons, the IRS sought extensive records including bank statements and cancelled checks. Id. at 318 n.4. The court held the "[government] does not seek to regulate or in any way become involved in the religious activities or control the financial matters of the church. It merely seeks to make a determination, based on all available and pertinent data, of the church's tax exempt status." Id. at 320.

Likewise, in this case, the municipality does not seek to regulate the taxpayer in any way. Rather, it merely seeks to make a determination as to whether the taxpayer is indeed entitled to tax exemption for the property. The municipality's review of the financial records will not change the way the taxpayer or the individuals conduct their affairs. Nor does the municipality seek to change the way the taxpayer or the individuals conduct their affairs. The prohibition of excessive entanglement is a shield, not a sword. It shields religious entities and individuals from excessive interference from the government. It is not a sword to preclude review of whether an exemption is appropriate.

Our courts have confronted similar situations in the past involving local property tax exemption applications based upon assertions of religious activity. In Shrine of Our Lady of Fatima v. Township of Mantua, 12 N.J. Tax 392 (Tax 1992), a property owner sought a tax exemption for a premises consisting of a home and a barn. Id. at 395. The exemption was initially granted, but then challenged by the

18

township.  Id. at 393.  The individual living at the premises was also working as a self-employed window treatment consultant and using the barn as an office.  Id. at 394.  As a result, the plaintiff abandoned the claim that the property was used for religious purposes and solely argued the district superintendent of a clergy used the residence as a parsonage.  Id. at 393-94.  Ultimately the court rejected the exemption.  Id. at 399.

In Abunda Life Church of Body, Mind & Spirit v. City of Asbury Park, 18 N.J. Tax 483 (App. Div. 1999), the Appellate Division noted that "the record is replete with examples of plaintiff's commercial activities on the property, none of which can be legitimately construed as religious in nature or incidental to religious activities."  Id. at 485.  Moreover, the Appellate Division indicated that the "[tax court] correctly found, the financial reports submitted were 'essentially meaningless in terms of indicating whether the plaintiff is operating on a nonprofit basis or not.'"  Id. at 486.  "The missing proofs included a general ledger for receipts, a daily cash receipts journal, donor records, and inventory data.  There was either no proof or insufficient proof as to revenue generated from the church's investments, income from advertising and plaintiff's printing business as well as payments from insurance companies relating to medical procedures performed on the premises."  Ibid.  As a result, the Appellate Division affirmed the Tax Court.  Ibid.

19

In <u>Dawn Bible Students Ass'n v. Borough of East Rutherford</u>, 3 N.J. Super. 71 (App. Div. 1949), twenty percent of the receipts from the church were transferred to the wife of a principal using an alias. <u>Id.</u> at 74. It was alleged she was paid commissions for broadcasting. <u>Id.</u> at 74-75. The court found:

> The unorthodox and unsatisfactorily explained method of turning over Association funds to [the wife], the depositing of those funds in her personal account and the payment of the Association's bills for radio broadcasting amounting to more than 40% of the total expenses in the tax year under review, the non-production of any statement of the financial transactions as between the Association, [the wife] and [another individual], which statement was concededly available, and the absence of any other documentary proof raises a real doubt on the decisive question of whether or not the Association was conducted for pecuniary profit.
> [<u>Id.</u> at 75.]

The exemption was denied. <u>Ibid.</u>

In the case at hand, this court has taken a measured approach in dealing with this issue. Previously, this court narrowed the scope of discovery and quashed the subpoenas for obtaining records directly from the bank. Instead, this court ordered the church to provide its bank account statements along with annotations. A review of the bank statements raises more questions than answers. There are: (1) numerous payments to QVC, a televised shopping network for fashion and home accessories; (2) numerous payments to Tractor Supply and auto supply stores, seemingly places where parts for the lawn equipment could be purchased; (3) numerous restaurant

20

expenditures; (4) unexplained cash transfers between accounts; and (5) expenses for animal and veterinarian supplies. Notably absent from the records are expenses for utilities including gas and electric.

The taxpayer insists that the municipality take the Pennettas' depositions and rely solely upon their credibility for explanations of any financial issues. First, the taxpayer does not get to dictate how the municipality conducts its case. Second, if the taxpayer's allegations are to be believed, the financial records will do nothing but further bolster and support entitlement to the tax exemption. Third, the Pennettas committed perjury either: (1) when they entered their guilty pleas in Superior Court; or (2) in their certification to this court when they claim they lied in their pleas to the Superior Court. Relying upon the credibility of their testimony alone may be problematic. Fourth, considering the Pennettas' convictions, relying upon their credibility is once again problematic. See N.J.R.E. 609.

Overall, the municipality is permitted to issue subpoenas to the banks for the banking records of the individuals and the entities through and including 2024.

21